# WHEELING.

BRIDGES vs. SHALLCROSS.

1873.
June Term.

WM. L. BRIDGES, PLAINTIFF, *against* THOMAS P. SHALLCROSS, DEFENDANT.

Decided July 19th, 1873.

## SYLLABUS.

1. The act passed by the legislature of West Virginia on the 14th day of January 1873, entitled "An act amending and re-enacting sec. one of Chap. 56 of the Code of West Virginia, concerning the Board of Public Works," is not repugnant to the 4th section of article the 7th of the constitution of the State of West Virginia. And the part or parts of the act of the legislature passed on the 1st day of April 1873, entitled "An act to amend and re-enact sec.'s two, six, seven, fourteen and nineteen of Chap. 163, of the Code of West Virginia, which are directly involved in or apply to this case, is and are not repugnant to said 4th section of said article 7 of the constitution of the State of West Virginia.

2. The said act of the legislature of the 14th day of January 1873 does not in fact, or effect, operate an appointment of the governor, and the other executive officers therein referred to, to a

different office or to different offices, but substantially prescribes the duties and powers of the governor and said other executive officers, to be by them exercised and performed as constitutional officers of the executive department of the government to which they were or may be elected. In other words, said act in substance and effect simply annexed to the offices of governor, and the other executive offices therein named, powers and duties.

3. Prescribing the "manner" in which public officers shall be elected and removed, as expressed in the 8th section of art. 4 of the constitution of the State of West Virginia, when read and considered in connection with article 7, sec.'s 1 and 8, and sec. 40 of article 6 and other sections of the same constitution, includes the agent or person who may appoint, as well as the formality with which it should be done.

4. The said act of the legislature of the State of West Virginia passed on the said 14th day of January, entitled, "An act amending, and re-enacting sec. one of Chap. 56 of the Code of West Virginia concerning the Board of Public Works" and enacting that said section be amended, and re-enacted so as to read as follows: "1. The governor, auditor, treasurer, superintendent of free schools, and attorney general, shall be and continue a corporation under the style of the "Board of Public Works;" is not repugnant to the constitution of said State, but is valid, and binding.

5. So much of the act passed by the legislature of the State of West Virginia on the first day of April 1873, entitled "An act to amend and re-enact sec.'s two, six, seven, fourteen, and nineteen, of Chap. 163 of the Code of West Virginia" as is directly involved in and applies to this case; especially the part and parts thereof by which it is enacted that the Board of Public Works shall on the 15th day of April in the year 1873, and every two years thereafter, appoint a superintendent of the penitentiary at Moundsville, whose term of service shall begin on the first day of May next after his appointment, and who should have the powers, and perform the duties of said office prescribed by law, and shall receive as an annual salary not to exceed $1500, at the discretion of the Board of Public Works; is not and are not repugnant to the constitution of the State of West Virginia, but is and are valid and binding.

On the 4th day of June 1873, William L. Bridges filed in the Supreme Court of Appeals a petition in which it was represented that on the 15th day of April 1873, at a meeting of the Board of Public Works, the said Board, pursuant to the provisions of an act of the legislature

passed April 1st 1873 entitled "An act to amend and re-enact sec.'s six, seven, fourteen and nineteen of Chapter one hundred and sixty-three of the Co e of West Virginia," did on the said 15th day of April 1873, appoint the petitioner to the office of superintendent of the penitentiary at Moundsville, for the term of two years, to begin on the 1st day of May 1873, and fixed the salary of the petitioner as such superintendent at fifteen hundred dollars per annum; that on the 28th day of April 1873, the petitioner presented to the said Board of Public Works, then in session, his official bond duly executed with security, in the penalty of ten thousand dollars, conditioned according to law, which was then approved and accepted, and the petitioner then took and subscribed and filed with the said Board of Public Works the oath of office required by law.

The petition further represented that on the 1st day of May 1873, the petitioner went to the penitentiary at Moundsville to enter upon the discharge of his official duties, and then and there demanded of Thomas P. Shallcross, who had been previously appointed superintendent of the said penitentiary under the laws in force at the time of such appointment, but whose term of office as such superintendent had expired and been determined by its own limitation and the appointment and qualification of the petitioner as his successor, to admit him to the office aforesaid, and to surrender to him the charge and custody of the said penitentiary and the convicts therein confined, and the property thereto belonging, and to turn over to him the same, together with the books, papers, and all things thereto belonging; but the said Shallcross refused to recognize the rights of the petitioner in the premises, and hindered and prevented him from taking possession and charge of the said penitentiary, and continued in possession thereof, and refused to admit the petitioner thereto. The petitioner prayed that a writ of *mandamus* should be awarded, directed to the said

Shallcross, commanding him to admit the petitioner to the said office of superintendent of the said penitentiary, and to surrender to him the possession and charge thereof, and to turn over to him all the property of every kind pertaining to the said office.

A *mandamus nisi* was awarded in accordance with the prayer of the petition, returnable June 18th 1873. On that day the defendant, Thomas P. Shallcross, filed the following return:

For return to the said *mandamus*, the defendant says that he has not admitted the said William L. Bridges to the office of superintendent of the penitentiary at Moundsville, or surrendered to him the custody and charge thereof, or of the prisoners confined therein, or the possession of the books, papers, or other property thereto appertaining; and for cause why he has not done the same, he now here shows to this Honorable Court:

That the legislature of this State on the 14th day of January 1873, passed an act entitled "An act amending and re-enacting section one of Chapter fifty-six, of the Code of West Virginia, concerning the Board of Public Works," thereby enacting that said section be amended and re-enacted so as to read as follows: "1. The governor, auditor, treasurer, superintendent of free schools and attorney general shall be and continue a corporation under the style of the "Board of Public Works;" and on the first day of April 1873, passed another act entitled "An act to amend and re-enact sections two, six, seven, fourteen and nineteen of Chapter one hundred and sixty-three of the Code of West Virginia," thereby enacting, among other things in the last mentioned act contained, that there shall be a board of directors of the penitentiary consisting of five persons, appointed by the Board of Public Works, on the fourth day of March, or as soon as practicable thereafter, and that they shall each be allowed as compensation for their services the sum to be fixed by the Board of Public Works, not to exceed three dollars for each day necessarily employed,

and ten cents per mile for every mile necessarily travelled in going to and returning from the penitentiary, by the most direct route; and that vacancies in the board shall be filled as they occur by the Board of Public Works: *Provided,* that no two directors shall be residents of the same county, and, *provided* further, that one director shall reside in the county of Marshall; and also enacting thereby that the present board shall continue in office until the fourth day of March 1873, and until their seccessors shall have qualified; and by the last mentioned act also enacting, among other things therein contained, that the Board of Public Works shall, on the fifteenth day of April, in the year 1873, and every two years thereafter, appoint a superintendent of the penitentiary at Moundsville, whose term of service shall begin on the first day of May next after his appointment, and who should have the powers and perform the duties of said office prescribed by law, and shall receive as an annual salary not to exceed fifteen hundred dollars, at the discretion of the Board of Public Works, and that the Board of Public Works may remove the superintendent, and said Board may fill any vacancy that may occur in the office of superintendent. All which, with other things, will more fully and at large appear by reference to said acts, to which the defendant here refers, and which he makes part of this his return as if here inserted. And the defendant now here further shows to this Honorable Court that the enactments above specified were and are repugnant to the constitution of this State, and of no effect in law. Nevertheless, the persons who on the 15th day of April 1873, were such auditor, treasurer, superintendent of free schools, and attorney general respectively, did, after the passage of said acts and by virtue thereof, and without any other authority or warrant therefor, assume to be and act as such Board of Public Works, and as such Board to appoint the said William L. Bridges to the office of superintendent of

the penitentiary at Moundsville, at the time and for the term in said *mandamus* specified. And the defendant further shows to this Honorable Court, that the said William L Bridges never had any other right, title or claim to the said office, or to the custody and charge of the said penitentiary, or of the prisoners confined therein, or to the possession of the books, papers or other property thereto appertaining, except under and by virtue of his supposed appointment aforesaid. Wherefore the defendant, as he lawfully might, for the cause aforesaid, did refuse and still refuses to admit the said William L. Bridges to the said office of superintendent, or to surrender to him the custody and charge of said penitentiary, or of the prisoners confined therein, or the possession of the books, papers or other property thereto appertaining.

To this return the plaintiff demurred.

*Boggess, Lee, and Ferguson* for the plaintiff.

*Lamb, Wheat, Fitzhugh, and Hogeman* for the defendant.

HAYMOND, President.

The only questions presented for the consideration and determination of the court by the demurrer of the complainant to the return of the defendant made to the *mandamus nisi* awarded in this cause are as follows viz:

First: Is the act passed by the legislature on the 14th day of January 1873, entitled "An act amending and re-enacting section one of Chapter fifty-six of the Code of West Virginia concerning the Board of Public Works, which provides that the governor, auditor, treasurer, superintendent of free schools, and attorney general, shall be and continue a corporation under the style of the "Board of Public Works," repugnant to the constituon of this State, and therefore null and void?

Second: Is the act of the legislature passed on the first day of April 1873, entitled "An act to amend and re-enact sec's. two, six, seven, fourteen, and nineteen of

Chap. 163, of the Code of West Virginia," providing among other things, that there shall be a board of directors of the penitentiary, consisting of five persons appointed by the Board of Public Works on the fourth day of March, or as soon as practicable thereafter, and also providing, among other things, that the said Board of Public Works shall on the 15th day of April in the year 1873, and every two years thereafter appoint a superintendent of the penitentiary at Moundsville, whose term of service shall begin on the first day of May next after his appointment &c, in so far as its provisions are involved in this case, repugnant to the constitution of this State, and therefore null, and void?

No question has been made or argued before us as to the remedy, by *mandamus*, adopted in this case not being the proper remedy to try and determine the questions involved, nor do we see, if it had been objected that the remedy adopted was not the proper one, that such objection could be successfully maintained under the authorities.

A case which presents to a court for determination the question whether a law or laws enacted by the legislature, according to the forms prescribed by the constitution, is or are null and void, because contrariant to the constitution, becomes at once greatly more grave and important than other ordinary cases in which such a question is not involved, and deserves and demands from the court, and each member thereof, the most serious and deliberate investigation, to the end that a proper and rightful decision may be had. Appreciating fully the magnitude and importance of the questions involved in this case for our determination, we entered upon the investigation and decision of the case with great caution and delicacy, and with a fixed purpose to arrive at a correct judgment so far as we are possessed of ability to perceive the right, according to the true meaning of the constitution. In the case of Fletcher *v.* Peck, 6th Cranch, 87, Judge

Marshall says: "The question whether a law be void for its repugnancy to the constitution is at all times a question of much delicacy, which ought seldom, if ever, to be decided in the affirmative, in a doubtful case. The court, when impelled by duty to render such a judgment, would be unworthy of its station, could it be unmindful of the solemn obligations which that station imposes. But it is not on slight implication and vague conjecture that the legislature is to be pronounced to have transcended its powers, and its acts to be considered void. The opposition between the constitution and the law should be such that the judge feels a clear and strong conviction of their incompatibility with each other."

In the case of Sharpe v. Robertson, 5. Gratt. 574 and 575, Judge Daniel holds this language: "The duty of enquiring into, and deciding upon the legal validity of an act of the legislature, has always been regarded by this court, and justly, as one of the most delicate it can be called upon to discharge;" and further: "Under a deep sense of the caution with which the subject, under such circumstances, ought to be approached, I have in its investigation earnestly endeavored to discard from my mind every influence calculated to mislead the judgment, and have been watchful to suffer no impression to mature into a conviction until its correctness had been first subjected to the test of a calm and impartial enquiry." In the same case Judge Brooke says: "The question before us is a different one. I have said it was a delicate question. This results from the different functions of the various departments of the goverment. The legislature is elected by the people; come immediately from the people; and they take an oath to support the constitution. They are clothed with the power to make laws; and many of the members are able lawyers. It should not therefore be in a doubtful case that the acts of that body should be decided by the courts to be unconstitutional." In the case of Eyre v. Jacob, Sheriff, 14

70

Gratt. 422, Judge Lee, who delivered the opinion of a majority of the court, says : "It has always been considered to be a most delicate office for a judge to undertake to pronounce an act of the legislature to be unconstitutional." "When a plain and palpable infraction of constitutional provision is shown in a law, upon the validity of which it is called upon to decide, it is of course one of the highest and most solemn duties of the court to declare such law to be inoperative and void. If however it be only upon slight implication or inconclusive reasoning that the supposed infraction can be made out, the court should never undertake to rescind and annul the solemn and deliberate act of the legislative department of the government. To doubt in such a case should be to affirm." In the case of Adams v. Howe et al. 14. Mass. R. 344 and 345, Parker C. J., in delivering the opinion of the court says : "We must premise that so much respect is due to any legislative act, solemnly passed, and admitted into the statute book, that a court of law which may be called upon to decide its validity, will presume it to be constitutional, until the contrary clearly appears. So that in any case of this kind, substantially doubtful, the law would have its force. The legislature is, in the first instance, the judge of its own constitutional powers ; and it is only when manifest assumption of authority, or misapprehension of it, shall appear, that the judicial power will refuse to execute it. Whenever such a case happens, it is among the most important duties of the judicial power to declare the invalidity of an act so passed." In the case of the Commonwealth v. McWilliams, 11. Pa. State R., Bell J. in delivering the opinion of the court expresses himself thus: "Of late years it has been much the fashion to impeach the action of legislative bodeis as unconstitutional, when it happens not to accord with the party's notion of propriety and abstract right. This is very frequently done in sheer oblivion of the doctrine that express prohibition or necessary implication is essential to oust the

State legislature of authority. Where this prohibition is not found in the primordial part, the exertion of a power cannot be deemed unconstitutional, even though it seems to trespass upon our ideas of natural justice and right reason." In the case of the People ex rel. Merchants Savings, Loan and Trust Co. of Chicago v. Auditor, 30. Illinois R. 438., Breese J., in delivering the opinion of the court, says : "We always approach questions of this nature with reluctance, and with great diffidence, for the legislature is a co-ordinate department of the government, whose exclusive province is to make laws. But the constitution is supreme over all the departments of the government, and it is for the judiciary so to declare, and to bring all enactments of the legislature to that standard—to test them by its provisions, when a question is made touching their validity ; always remembering, that only in a clear and palpable case will the court pronounce againt the validity of an enactment. If it be doubtful, the doubt is usually solved, and should be, in favor of the legislative power." In the case of Bunn et al v. The People ex rel. 45 Illinois R. 411 and 412, Chief Justice Breese, who delivered the opinion of the court, again holds and re-announces the same views as those just quoted from 30 Illinois R., and he also refers to 44 Illinois R. 229. On referring to the report last named we find this principle held by the court, viz: "Statutes will not be held unconstitutional except in the clearest cases. This court has repeatedly declared that it will not pronounce a statute unconstitutional, except in a case where the violation is plain and palpable." In the case of The People v. Simeon Draper, 15 N. Y. R. 543, Judge Denio in delivering the opinion of the court holds, that: "In the first place, the people, in framing the constitution, committed to the legislature the whole law making power of the State which they did not expressly or impliedly withhold. Plenary power in the legislature for all purposes of civil government is the rule. A prohibition to exercise a particular power

is an exception.   In enquiring, therefore, whether a given statute is constitutional, it is for those who question its validity to show that it is forbidden."   "It has been said by an eminent jurist, that when courts are called upon to pronounce the invalidity of an act of legislation, passed with all the forms and ceremonies requisite to give it the force of law, they will approach the question with great caution, examine it in every possible aspect, and ponder upon it as long as deliberation and patient attention can throw any light upon the subject, and never declare a statute void, unless the nullity and invalidity of the act are placed, in their judgment, beyond reasonable doubt."   16 Pick. 95, per Shaw, C. J.   "A reasonable doubt must be solved in favor of the legislative action, and the act be sustained."   Cooley's Con. Lim. 182, and the many authorities there cited.   In the case of Ogden v. Saunders, 12 Wheaton R. 231, Judge Washington says: "But if I could rest my opinion in favor of the constitutionality of the law on which the question arises, on no other ground than this doubt, so felt and acknowledged, that alone would, in my estimation, be a satisfactory vindication of it.   It is but a decent respect due to the wisdom, the integrity and the patriotism of the legislative body by which any law is passed, to presume in favor of its validity, until its violation of the constitution is proved beyond all reasonable doubt." "Cooley's Con. Lim. 183.

In the case of Dow v. Norris, 4 N. H. 17, the Supreme Court of New Hampshire recognize their obligation "so to construe every act of the legislature as to make it consistent, if it be possible with the provisions of the constitution," and proceed to the examination of a statute by the same rule, "without stopping to enquire what construction might be warranted by the natural import of the language used."   "A legislative act is not to be declared void upon a mere conflict of interpretation between the legislative and judicial power.   Before proceed-

1873.
June Term.

Bridges
v.
Shallcross.

ing to annul, by judicial sentence, what has been enacted by the law making power, it should clearly appear that the act cannot be supported by any reasonable intendment or allowable presumption"—So says Harris J. in delivering the opinion of a majority of the court in the case of The People v. Supervisors of Orange, 17 N. Y. R. 241.

The people by the adoption of the constitution created a legislative department upon which they conferred the legislative power, and in granting it in general terms, they must be understood to grant the whole legislative power which they possessed, except so far as at the same time they imposed restrictions. "The government of the United States is one of enumerated powers; the governments of the States are possessed of all the general powers of legislation. When a law of Congress is assailed as void we look into the national constitution to see if the grant of specified powers is broad enough to embrace it; but when a State law is attacked on the same ground, it is presumably valid in any case, and this presumption is a conclusive one, unless in the constitution of the United States, or of the State, we are able to discover that it is prohibited. We look in the constitution of the United States for *grants* of legislative power, but in the constitution of the State to ascertain if any *limitations* have been imposed upon the complete power with which the legislative department of the State was vested in its creation. Congress can pass no laws but such as the constitution authorizes, either expressly or by clear implication; while the State legislature has jurisdiction of all subjects on which its legislation is not prohibited" Cooley's Con. Lim. 173. In the case of Thorpe v. Rutland & Burlington Railroad Co., 27. Vermont R. Chief Justice Redfield says: "It has never been questioned that the american legislatures have the same unlimited power in regard to legislation which resides in the British Parliament, except where they are restrained

by written constitutions. That must be conceded, I think, to be a fundamental principle in the political organization of the American States. We cannot well comprehend how, upon principle, it should be otherwise. The people must, of course, possess all legislative power originally. They have committed this in the most general and unlimited manner to the several state legislatures, saving only such restrictions as are imposed by the constitution." See also Cooley's Con. Lim. 87, 88, 168. Ulquehamer *vs.* People, 13th, N. Y. R. 391. City of Richmond *v.* Daniel, 14 Gratt., 385. From these many respectable authorities we deduce these principles as being incontestably correct.

1st. When the courts are called upon to pronounce the invalidity of an act of legislation passed with all the forms and ceremonies required by the constitution, they should approach the question with great caution and delicacy, and never declare a statute void, unless the nullity and invalidity of the act are placed in their judgment beyond reasonable doubt.

2nd. It is the duty of the court to presume in favor of the validity of the act, until its violation of the constitution is proved beyond all reasonable doubt.

3rd. In case of a reasonable doubt of the constitutionality of the act the doubt must be solved in favor of the legislative action, and the act be sustained.

4th. The courts should sustain legislative action when not clearly satisfied of its invalidity; and unless it clearly appears that it is contrariant to the constitution then there is reasonable doubt of its invalidity, and it should be sustained and enforced.

5th. The legislative power in a State possesses the absolute and uncontrolled power of legislation except, *first,* as it may be limited by the constitution of the United States, and *second,* as it has been clearly limited by the Constitution of the State. It possesses all the legislative power which the people themselves could confer, except so far

as it is clearly restricted by constitutional provision or a declaration of rights, or both.

6th. Whenever the legislature is expressly prohibited by the constitution from doing any particular act, and it clearly appears that the same has been done in violation of such prohibition, it is the duty of the courts, upon a proper case presented before them, to declare such act null and void.

7th. Although such act is not expressly prohibited by the constitution, yet if it manifestly and clearly appears that the act is repugnant to the constitution, the courts will declare it null and void.

The legislative authority, to be efficient, must have large discretion in determining the means through which its acts shall be executed, and the performance of many duties which they provide for by law they may refer either to the chief executive of the state, or at their option, to any other executive or ministerial officer. Powers or duties not specifically conferred upon the governor by the constitution, the executive cannot exercise or assume except by legislative authority; and the power which in its discretion it confers, it may also withhold or confer in other directions. Cooley, Con., Lim. 114 and 115. The constitution of a State is a limitation upon the powers of the legislative department of the government, but it is to be regarded as a grant of powers to the other departments. Neither the executive nor the judiciary, therefore, can exercise any authority or power except such as is clearly granted by the constitution.— Field v. People, 2 Seam. 80.

Where there has been contemporaneous practical construction of particular provisions of the constitution, or of similar provisions in a constitution or constitutions of the same State preceding the constitution containing the provision or provisions in question, which has been acquiesced in for a considerable period, considerations in favor of adhering to this construction sometimes pre-

1873.
June Term.

Bridges

Shallcross.

sent themselves to the courts with a plausibility and
force which it is not easy to resist.    Indeed, where a par-
ticular construction has been generally accepted as cor-
rect, and especially when this has occurred contempora-
neously with the adoption of the constitution, or under
a constitution immediately preceding, and by those
who had an opportunity to understand the intention of
the constitution, or a provision thereof in question, it is
not to be denied that a strong presumption exists, that the
construction rightly interprets the intention.    Cooley,
Con. lim. 67.    The Supreme Court of the U. S. has fre-
quently considered this subject.    In Stuart *v* . Laird, 1.
Cranch    299, decided in 1803, that court sustained the
authority of its members to sit as circuit judges, on the
ground of a practical construction, commencing with the
organization of the government.    In the case of Cohens
*v.* Virginia, 6.    Wheaton 264,    Chief Justice Marshall
said: "Great weight has always been attached, and very
rightly attached to contemporaneous exposition."    In
the case of the Bank of the U. S. *v.* Halsted, 10
Wheaton 51, Justice Thompson says:    "If any doubt
existed whether the act of 1792 vests such power in the
courts, or with respect to its constitutionality, the prac-
tical construction given to it ought to have great weight
in determining both questions.    In the case of Ogden
*v.* Saunders, 12 Wheaton, 290,    Justice Johnson in
commenting upon this subject says:    "Every candid
mind will admit that this is a very different thing from
contending that the frequent repetition of wrong will
create a right.    It procedes upon the assumption that the
contemporaries of the constitution have claims to our
deference on the question of right, because they had the
best opportunities of informing themselves of the un-
derstanding of the framers of the constitution, and of
the sense put upon it by the people when it was adopted
by them.    See also Martin *v.* Hunter, 1 Wheaton, 304;
Rogers *v.* Goodwin, 2 Mass. 475; State *v.* Mayhue, Gratt.

1873.
June Term.

Bridges
v.
Shallcross.

487; Bingham *v.* Miller 17 Ohio 446; Johnson *v.* Joliet & Chicago R. R. Co. 23 Illinois R. 207.

Article 7, section 4, of the constitution is in these words: "Neither the Governor, State Superintendent of Free Schools, Auditor, Treasurer, nor Attorney General, shall hold any other office during the term of his service. The Governor shall be ineligible to said office for the four years next succeeding the term for which he was elected."

Article 7, section 8 reads thus: "The Governor shall nominate, and by and with the advice and consent of the Senate (a majority of all the Senators elected concurring by yeas and nays,) appoint all officers whose offices are established by this constitution, or shall be created by law, and whose appointment or election is not otherwise provided for; and no such officers shall be appointed or elected by the Legislature."

It is argued by the counsel for Defendant: First, that the act of January 14th 1873 in question is a legislative appointment to office in contravention of the said 8th section of article 7, of the constitution. And Second, that the persons who hold and exercise the power assigned to them by said act, hold two different offices in contravention of the same article. These propositions the Defendant affirms as the reason why the acts of the legislature are null and void. The propositions are affirmative, and it is for the Defendant to show to the Court, clearly and beyond reasonable doubt, that one or both of them are true. Has this been done is the question to be decided. In disposing of these propositions, we propose to consider the second proposition first. In order to a right understanding of the constitution upon the question at issue, it is necessary that we should here quote a few other sections thereof. Article 4, of the constitution is entitled "Elections and Officers" and the 8th section thereof is in these words, "the Legislature, in cases not provided for in this constitution, shall prescribe by general laws, the terms of office, powers, duties and com-

71

pensation of all public officers, and agents, and the manner in which they shall be elected, appointed and removed." Article 5, of the constitution is as follows: "The Legislative, Executive and Judicial Departments shall be separate and distinct, so that neither shall exercise the powers properly belonging to either of the others; nor shall any person exercise the powers of more than one of them at the same time, except that Justices of the Peace shall be eligible to the Legislature." Article 7, section 1 of the constitution, which is entitled "Executive Department" reads thus: "The Executive Department shall consist of a Governor, Secretary of State, State Superintendent of Free Schools, Auditor, Treasurer and Attorney General, who shall be *ex officio* reporter of the Supreme Court of Appeals. Their term of office respectively shall be four years, and shall commence on the fourth day of March next after their election. They shall, except the Attorney General, reside at the seat of Government during their term of office, and keep there the public records, books and papers pertaining to their respective offices, and shall perform such duties as may be prescribed by law." The 40th section of article 6, of the constitution reads thus: "The Legislature shall not confer upon any court or judge the power of appointment to office, further than the same is herein provided for." Article 8, section 21, of the constitution reads thus: "Wherever the Legislature is expressly prohibited by this constitution from doing any particular act, and the same shall be done, in violation of such prohibition, it shall be the duty of the courts, upon a proper case presented before them, to declare such act null and void." It is maintained by the counsel of the Complainant that the said act of the 14th of January 1873 in substance and effect, simply prescribes additional powers and duties to be performed by officers already elected by the people, and that it does not amount to an appointment to an office created by law; but that it only amounts to requiring the officers of the executive department, by virtue of their respective offices

to which they had been elected by the people to a members of the Board of Public Works, that it in substance simply annexes additional powers and duties to their respective offices; that it has been a time honored usage in Virginia, and continued in West Virginia ever since its formation, to cause certain duties which might have been assigned to officers specially appointed or elected for the purpose, to be performed by officers already appointed for general service, and associated by law in the form of a board or a corporation for the supposed benefit of the united counsel of several, and for the more convenient discharge of such duties; and that the acts prescribing this form of service have never been questioned as unconstitutional, either because they violated the provision in the constitution separating the three departments of government, forbidding the exercise by either powers belonging to the other, or the exercise by any person of the powers of more than one of them at the same time (with the single exception of permitting justices to be members of the legislature, or the provision forbidding certain officers to perform the duties of any other office during their term of service. In the case of Sharpe v. Robertson, 5 Gratt. 518 it was decided by the Court of Appeals of Virginia that: "The act of March 31st, 1848, Sess. Acts p. 51 establishing a special Court of Appeals, constituted of judges of the circuit courts, is constitutional. That a *per diem* compensation to the judges holding the special court for the time they sit therein, in addition to their salaries as judges of the circuit courts, is constitutional. And that the special court of appeals is not a Supreme Court of Appeals, but belongs to the class of superior courts provided for in the constitution of *Virginia.*" In that case constitutional objections to the act of the Virginia Legislature, not dissimilar in principle and importance to the most grave made in this case, were interposed before the Court of Appeals of Virginia.

Judge Baldwin in delivering his opinion in the case, which seems to have been concurred in substantially by a majority of the Court, says, on page 611: "A judicial office imports the legal capacity and obligation of the incumbent to render judicial service, by holding one or more Courts of Justice; and it is true, that when the whole service is extinguished by competent authority, the office itself is thereby abolished. But the act in question creates no new judicial offices, and appoints no additional Judges; but merely attaches new duties to judicial offices already existing, to be performed by incumbents within the constitutional power of the Legislature." The Judge further says, in same opinion, page 616: "The question, it will be observed, is not what power over this subject has been granted to the Legislature by the Constitution, but what power in regard to it is inhibited to that department, by express terms or strong and clear implication." See also upon this subject the very strong and pointed case of Ephriam Wales v. Thomas Belcher in 3 Pick. R, 508. It would occupy too much space for us to undertake to give full statements of the case last cited. We can only refer to them, and those who desire to do so, can consult the reports in which they are contained. We think much valuable light is thrown upon this subject by recurring to the constitutions of Virginia of 1776, 1830 and 1851 and of the former constitution of this State, and the practical construction placed upon provisions in these constitutions not dissimilar to those in the present constitution now under consideration, especially the 4th section of article 7 before recited. The counsel for the complainant, at the argument of this cause, furnished us with references to these constitutions, and various acts of the legislatures of Virginia and West Virginia applicable to the subject under consideration, and as we consider them as relevant and appropriate we cite them briefly as given. The third section of the constitution of Vir-

ginia of 1776 in 1 R. Code of 1819 is àlmost in the exact words of the 5th article of the present constitution of this State. The section forbids the exercise by other departments of the powers properly belonging to the others, or the exercise by one person of the powers of more than one department at the same time, "except that the justices of the county court shall be eligible to the House of Assembly." Under this constitution the legislature of Virginia passed these acts, viz : Act of February 12th 1811, constituting the governor, lieutenant-governor, treasurer, attorney general and president of the court of appeals, a body politic and corporate under the name of president and directors of the literary fund. Pleasant's supplement to the revised Code of 1808, Vol. 2, p. 68, Chap. 62. An Act of March 3rd 1819, sec. 6, 1. R. C. (1819) p. 83, constituting the same corporation of same officers. Act of February 5th 1816, 2. R. C. (1819) secs. 3 and 4, p. 201, 202, constituting a corporation under the name of the board of public works to consist of the governor, treasurer, attorney general and ten citizens. Act February 24th 1823, Supp. R. C., 435, 444, Chap. 351, sec. 1, providing that governor, lieutenant-governor, treasurer, suditor and second auditor should be *ex officio* the president and directors of the corporation known as the James River Company, then owned by the State. Act of February 19th 1820, Supp. to R. C. of 1819 Chap. 16, p. 32, providing that in the absence of the president of the court of appeals the senior judge of that court shall act as a member of the board of directors of the literary fund in lieu of the president. Act of February 25th 1829, Supp. R. C. p. 43, sec. 13, making the board to consist of the governor, treasurer and first auditor to perpetuate the corporation of the president and directors of the literary fund. The constitution of Virginia, adopted January 30th 1830, Supp. R. C. p. 16, "contains the same division of powers of the gov-

ernment into three departments as that of 1876, forbids the exercise by either of powers of the others, or the exercise by any person of the powers of more than one at the same time." Under this constitution the legislature of Virginia passed the following acts, viz: Act of March 19th 1831, Sess. Acts p. 153, constituting the governor, treasurer, attorney general and second auditor a corporation by the name of the president and directors of the North Western Turnpike Road, for the purpose of constructing a turnpike road on State account from Winchester to the Ohio River. The road was constructed by the corporation from Winchester to Parkersburg. Act of April 2nd 1831, repealing former laws constituting the board of public works, and making the board thereafter to consist of the governor, lieutenant-governor, treasurer and second auditor, Supp. R. C. pages 414, 415, 1. 6.

Act of March 5th 1833, sec. 1, p. 97 providing that the governor, treasurer, auditor and second auditor, should thereafter constitute the board of public works, the James River Company, the Literary Fund and the North Western Turnpike Road Company with full power to transact all the business of these various boards. Act of March 16th 1838, directs the board of public Works to construct a turnpike road from Staunton to Parkersburg, and giving the board for that purpose all the powers, and subjecting it to all the duties given to and imposed upon the president and directors of the Northwestern Turnpike Road. The constitution of Virginia of 1851, contains the same separation of the government into three departments as the former constitutions, and the same restrictions, art. 2, Code of Virginia of 1860, p. 38. The 5th article of this constitution, sec. 1, page 48 of Code of 1860, provides that the governor shall be ineligible "to any other office during his term of service." Still the 5th article, section 5, makes him commander in chief of the military and naval forces

of the State. Under this constitution, and after its adoption, the legislature of Virginia by law made the governor, treasurer, the two auditors and the register of the land office a corporation by the name of the board of the literary fund, with all the powers then vested in the president and directors of the literary fund: Code of Virginia of 1860, p. 414. Governor, secretary of the commonwealth and auditor of public accounts, made judges of elections of attorney general, judges and commissioners of public works. Same Code, p▪ 90. Governor authorized to issue warrants in certain cases for the arrest of persons and compel them to leave the State: Same Code, p. 118. Governor made law giver to the penitentiary: Same Code, pp. 851, 853. At the restoration of the government of Virginia in 1861, the legislature of the Restored Government at Wheeling passed an act making the governor, first auditor, treasurer, and the secretary of commonwealth, a corporation as the board of the literary fund. Acts of 1861-2, p. 33. In the constitution of this State of 1863, article 1, sec. 4, there are the same divisions of government, and the same restrictions as in the constitution of Virginia above cited, and the 5th article, section 1, of that constitution, expressly provided that: "The person acting as Governor shall not be elected or appointed to any other office during his term of service." Still the 3rd section of same article makes him commander in chief of the military forces of the State, &c. Under this constitution, to wit the constitution of 1863 of this State, the legislature passed the following acts, viz : Act of December 10th, 1863, Chap. 137, sec. 53 makes the governor, auditor, treasurer, secretary of the state and the general superintendent of free schools, a corporation under the name of the "Board of School Fund."

Acts of 1863 Chap. 32 p. 32 makes the governor, auditor, treasurer and secretary of state, a corporation under the name of "Board of Public Works." Act of October 3rd 1863, makes Governor agent of the State con-

cerning scrip received for the benefit of mechanics, arts and agriculture. At the revisal of the laws of this State as enacted by the legislature in 1868, the governor and the same officers are continued a corporation under the name of the Board of Public Works. Code of West. Virginia p. 412. This revisal of the laws of this State,. and the adoption of the Code of 1868, were all under the constitution of this State of 1863. By Chap. 45 Code of this State of 1868 secs. 68, 69 the governor, auditor, treasurer, secretary of state and general superintendent of free schools were made a corporation under the name of "The Board of the School Fund," the auditor to be secretary of the board. So far as we have been able to learn, and there is no doubt of the fact, each and all the officers named in the acts of the legislature of Virginia, which were passed under the constitution of Virginia which we have cited, took upon themselves the duties and powers conferred by the several acts, and they did so, not because it was considered that the several acts, or any of them, conferred upon them different offices from those to which they had been, or were otherwise appointed or elected; but because it was considered and held that said acts only conferred additional powers and duties upon their offices to which they were otherwise appointed or elected. Although in Virginia and in this State there have always been laws in force requiring persons elected or appointed to office to take a prescribed official oath; still, in no instance were the officers named in said acts, or any of them, ever required to take an oath of office on account of the additional duties and powers imposed or conferred thereby upon them as officers. It was universally deemed and considered by all the departments of government that no such oath of office was necessary or proper; that in reality no new office or offices were created by any of said acts, or appointments made to office, but only new and additional powers and duties conferred and imposed upon offices and officers already

in existence, otherw se appointed or elected, and who had taken the oaths of office prescribed by laws. The governors of Virginia who served as such under the constitution of 1851, were men of undoubted intelligence and patriotism, and several of them were eminent statesmen and jurists, and were members of the convention who framed that constitution.

The governors of this State under the constitution of 1863, without exception, by virtue of the acts of the legislature of this State before cited, and by virtue of their office to which they had been elected by the people, served upon the Board of Public Works &c., of this State up to the adoption of the present constitution, and the present governor since its adoption until sometime during the past winter or spring. These are matters of public history.

The present constitution was adopted on the 22nd day of August 1872. The governors of this state were, and are, men of intelligence, elevated to their high and honorable office by the people for their patriotism and integrity. In the foregoing, we have the interpretation and meaning of the inhibition contained in the constitution of 1851, of Virginie, and the constitution of this State of 1863, as to the governor holding any other office during his term of service, as given and continually acted upon by the different departments of government, as well also as the approval thereof, and acquiessence therein of the people of both States, and of this State up to the day of the adoption of the present constitution, and subsequently thereto. We also have the continual and unvarying interpretation and meaning attached by the different departments of government, to the article or sections of the various constitutions of Virginia as to the division of government into departments, and the restrictions imposed from the date of her first constitution to the adoption of our present constitution. These interpretations and meanings, as understood and practiced by

72

all of the departments of government, and approved and acquiesced in by the people of Virginia and of this State so long, are too clear and well known in our judgements to admit of doubt. It being our duty to interpret the clauses of the constitution in question, according to the meaning and intention of the people in their adoption, and when they adopted them, under the authorities and facts before cited and stated, we feel bound in conscience and judgment to hold that the inhibition as to the governor and the other officers of the executive department holding other offices during their term of service, is substantially the same in the present constitution as it was, as to the governor, in the constitution of Virginia of 1851, and the constitution of this State of 1863, no more and no less; and that the same meaning must be attached to the inhibition as to the governor and the other executive officers, as contained in the present constitution, as was attached to the meaning of the same inhibition as to the governor, as contained in said constitutions of 1851, and 1863. We, under these circumstances, feel that the faithful discharge of our official duty requires, that we should determine that the said act of the legislature of the 14th of January 1873, is not null and void, because repugnant to the 4th section of article the 7th of the constitution of this State; and so of the act of the first day of April 1873, so far as it is applicable to this case, and is involved in the decision thereof; that the said act of the 14th of January 1873, when properly viewed, and its object and substance and not the mere shadow is well understood, does not in fact operate an appointment of the governor, and the other officers therein referred to, to another or different office; but, in substance, to prescribing the powers and duties of the governor and said other executive officers, to be by them performed as constitutional officers of the executive department of the government to which they were or may be elected. This the legislature had full power

to do under the provisions of the 8th section of the 4th article of the constitution, and also the last clause of the 1st section of the 7th article thereof when read and considered with section 8 article 7 and section 40 article 6, as it seems to us.

It now remains for us to determine whether said acts mentioned in the return of the Defendant to the writ of *mandamus nisi*, or either of them, so far as directly or necesarily involed in this case, are invalid and null and void, because contrariant to the said 8th section of the 7th article of the constitution.   Many of the principles we have announced and authorities we have cited heretofore apply with point and force here.   In Cooley's Con. Lim. pp. 57 and 58, we find these principles announced as applicable in the construction of state constitutions: "Every such instrument is adopted as a whole, and a clause which standing by itself might seem of doubtful import, may yet be made plain by comparison with other clauses or portions of the same law.   It is therefore a rule of construction, that *the whole is to be examined with a view to arriving at the true intention of each part*.   And this Sir Edward Coke regards the most natural and genuine method of expounding a statute: "If any section (of a law) be intricate, obscure or doubtful, the proper mode of discerning its true meaning is by comparing it with the other sections, and finding out the sense of one clause by the words or obvious intent of another."   And in making this comparison it is not to be supposed that any words have been employed without occasion, or without intent that they should have effect as a part of the law.   The rule applicable here is, that *effect is to be given, if possible, to the whole instrument,* and to every section and clause.   If different portions seem to conflict, the courts must harmonize them if practicable, and lean in favor of a construction which will render every word operative, rather than one which may make some idle and nugatory.   This rule is especially applicable to written constitutions in which the people will be presumed

to have expressed themselves in careful and measured terms, corresponding with the immense importance of the powers delegated, leaving as little as possible to implication. It is scarcely conceivable that a case can arise where a court woud be justifiable in declaring any portion of a written constitution nugatory because of ambiguity. One part may qualify another so as to restrict its operation, or apply it otherwise than the natural construction would require if it stood by itself; but one part is not to be allowed to defeat another, if by any reasonable construction the two can be made to stand together.

It is argued by the counsel for the Defendant that, if the act of 14th of January 1873 is not unconstitutional, because it does not appoint the governor, and the other executive officers therein named, to a different office, and because it does not in fact and substance appoint to any office, but only prescribes powers and duties of the governor and other officers of the executive department then it is contended that the said act of the 1st day of April 1873 or rather section 7 of said act which reads as follows: "The Board of Public Works shall on the 15th day of April in the year 1873 and every two years thereafter, appoint a superintendent of the penitentiary at Moundsville, whose term of service shall begin on the 1st day of May next after his appointment" &c, is unconstitutional because under the 8th section of the 7th article of the constitution the legislature cannot by law confer the power to appoint to office upon the Board of Public Works. In order to a proper understanding of the 8th section of said 7th article it is proper to read together with it, and immediately after it, the 8th section of the 4th article and then the latter clause of the 1st section of the 7th article and also the 40th section of the 6th article.

If under the 8th section of article 7, the legislature cannot confer the power of appointment to office upon either, or all together, of the offices of the executive de-

partment, then we think that it is not within the power of the legislature to provide for the filling of an office which is, or may be, created by law, by election by the voters. The construction of this section which prohibits the one must prohibit the other. The section plainly recognizes authority in the legislature to create offices by law, that is to say offices unknown to the constitution, and if such authority was not recognized in the constitution, as we have seen, the legislature would possess the power unless inhibited therein by the constitution. The constitution creates a number of offices, and it provides how they shall be filled with scarcely an exception, and it is not now recollected that but one of these offices is authorized to be filled by the governor by and with the advice and consent of the senate, and that is the office of the secretary of State. If this mode of appointment had been the selected favorite mode of appointment to office with the framers of the constitution, it seems to us that they would have provided for the filling of more of the constitutional offices in the same way. Yet they did not do so. It will be observed that this section, and no other part of the constitution confers upon the governor the power of original appointment to office. The only power of original appointment to office confered upon the governor is that he, "Shall nominate, and by and with the consent of the Senate (a majority of all the Senators elected concuring by yeas and nays) appoint all officers whose offices are established by this Constitution, or shall be created by law, and whose appointment or election is not otherwise provided for; and no such officer shall be appointed by the Legislature." It is quite clear that if by reason of this section the legislature cannot confer upon all the officers of the executive department by law the power of appointment to office, it cannot confer the power upon the governor alone. If the power to fill all officers was intended by the framers of the constitution to be confined to the single mode of appointment pointed out in this section, when not otherwise provided in the constitution,

1873.
June Term.

Bridges
v.
Shallcross.

why did they at the conclusion of the section add these words, "And no such officer shall be appointed by the Legislature?" Such a provision, if such was the purpose, was, and is wholly unnecessary and meaningless. Again it may be well asked why did the framers of the constitution insert the 40th section of the 6th article in the constitution which reads thus: "The Legislature shall not confer upon any court or judge the power of appointment to office, further than the same is herein provided for?" With the construction aforesaid of said 8th section of article 7, this section was, and is, also nugatory and meaningless. Again, if the construction contended for above indicated is correct, then so much of the 8th section of the 4th article, as requires the legislature in cases not provided for in the constitution to prescribe by general laws the manner in which all public officers shall be elected or appointed, was also unnecessary and meaningless. If the construction is right, the manner of appointment is provided by said 8th section of article 7. The 8th section of article 4 of the constitution, is a literal copy of the same section in article 3 of the constitution of this State of 1863. Prescribing the *manner* in which public officers shall be elected, appointed and removed, as provided in the 8th section of article 3 of the former constitution of this State, includes the agent or person who shall appoint as well as the formality with which it shall be done, according to the practical legislative construction given to it while it was in force. See Chap. 163, secs. 2 and 7 Code of West Virginia; Chap. 3, sec. 22, of same; Chaps. 7 and 4 of same, and other legislation to which it is unnecessary to specially refer. This construction was never controverted; but approved and acquiesced in. The same may be said of the legislative construction of the word "manner" as used in article 4, section 6 of the constitution of Virginia of 1830, see Code of Virginia 1849 Chap. 24.

The same may be said of the legislative construction

placed on the same word as employed in the constitution of Virginia of 1851, in article 5, section 19. See Code of Virginia 1860, Chap. 24. And the same as to the same word in article 4, section 38 of same constitution. See Code of Va. of 1860, Chaps 6, 7, 8 and 10. In the case of Taft v. Adams, decided in the Supreme Court of Massachusetts, and reported in 3 Gray's R. 126. Shaw, C. J., in delivering the opinion of the Court says: "When it is said in this statute, that county commissioners shall be chosen "in the manner prescribed in the revised statutes," we think this expression means not only the warrant for the meeting, and ballotting by the voters in towns, but extends to all the other provisions necessary to give effect to the choice; such as returning, examining and declaring the votes, so as to make a complete election to the office." The former constitution of this State in article 3, section 6 provides that: "All officers under this constitution may be removed from office for misconduct, incompetence, neglect of duty or other cause in such manner as may be prescribed by general laws." Section 7 of the same article provides that vacancies in office, "Shall be filled in such manner as may be prescribed by law." The word *"manner"* as used in these two sections, was evidently intended to authorize the legislature to designate what tribunal should exercise the power of removal from office, and who should fill vacancies in office. The legislature so construed it, and acted accordingly by passing appropriate laws providing the tribunal to remove, and who should fill vacancies in office. In section 16 of article 6 of the same constitution, it is provided that the attorney general may be removed from office "in the same manner as the Judges." It will be seen by reference to the 13th section of the same article, that it provides as follows: "Judges may be removed from office for misconduct, incompetence or neglect of duty, or on conviction of an infamous offence, by the concurrent vote of a majority of all the members

elected to each branch of the Legislature, and the cause of removal shall be entered on the journals. The Judge against whom the Legislature may be about to proceed shall receive notice thereof, accompanied by a copy of the cause alleged for his removal, at least twenty days before the day on which either branch of the Legislature shall act thereon." " Here the *manner* in which the attorney-general was to be removed from office clearly includes not only the proceedings before the tribunal having the power of removal, but the tribunal itself, to-wit, the Legislature." If this is not true, the legislature could have conferred the power to remove the attorney-general upon some other tribunal. In sections 6 and 7 of article 4 of the present constitution touching removals from office and filling vacancies therein the word *"manner"* is used in the same sense as in the former constitution in article 3 thereof. Sections 6 and 7 and section 11 of 4th article of the present constitution provides that: " The Legislature shall prescribe the "manner" of conducting and making returns of elections, &c." Article 8 section 2 touching judges of the Supreme Court of Appeals provides that : "They shall be elected by the voters of the State, and shall hold their offices for the term of twelve years, unless sooner removed in the manner prescribed by this Constitution. Section 18 of the same article prescribes the *"manner"* thus, "Judges may be removed from office by a concurrent vote of both Houses of the Legislature, &c." Here again the word "manner" as employed in the constitution clearly means not only the proceedings before the tribunal but also the tribunal having the power of removal. See, also, article 6, section 34, article 8 sections 10, 19. The present constitution when referring to a limitation therein generally uses the words "herein," "hereby" or "this constitution." See article 4, sections 6, 7, 8; article 6, sections 5, 11, 32, 40; article 7, sections 10, 19; article 8, sections 10, 23, 34; article 9, section 5; article 11, sections 3, 9; article 12, sections 4, 9; article 13, section 4; schedule

sections 4, 12, 17, 20. From this apparent rule of the constitution in regard to limitations created on its face, it would reasonably be supposed that if, the framers of the constitution intended to cut off from the legislature the power and authority to confer by law the power to appoint to office, upon officers already elected by the people in accordance with the constitution and laws, or appointed in pursuance of law, they would have done it by the employment of clear and express words, and left no room for doubt. If in the said 8th section of the 7th article, the framers of the constitution had inserted immediately after the word "for" the words "in this constitution," there would have been more plausibilityfor the construction contended for by the Defendant. But they did not insert those words, and not having inserted them we do not feel authorized in the discharge of our duty under the authorities to insert them by construction, and read the section as though they were therein contained. If we felt authorized to interpolate the words "in this constitution," after the said word "for," with equal propriety we should follow the words "in this constitution" with the further words "or by law." But it is said the use of the present indicative "is" after the word election in the 5th line of said section 8, was intended as a limitation to provisions then made and existing. This we think is not true here any more than the use of the same verb in article 4, section 1, article 7, sections 13, 16, article 8, sections 3, 4, 23, 24, was intended. See the use of the same verb in chapter 205, sections 1, 2, 6, 7, 8, 10, 11, 12, 13, of Code of 1860. Evidently one object of the framers of the constitution in prohibiting the legislature from appointing or electing persons to office, was to prevent the time and attention of the legislature from being taken up in that way further than possible. But if the construction of the Defendant be sanctioned, they certainly accomplished nothing in that direction; for the senate is one branch of the legisla-

ture. If the very numerous officers of various descrip-
tions whose election or appointment is not provided for
in the constitution should have to be appointed by the gov-
ernor, by and with the advice and consent of the senate,
very much of the short allotted time of the sessions of
that body would necessarily be consumed in acting on
the governor's nominations for office in neglect of more
important legislative duties. The immense number and
description of various officers, the governor and senate,.
in.such case, together would appoint, would be a source
of serious consideration for the people, and, as we think,
would . clearly defeat the purposes and objects of the
framers of the constitution. It was suggested, however,
in argument by at least two of the counsel for Defend-
ant, that the officers contemplated by said 8th section
were only the state and state institutions. The section
contains no such limitation on its face. Whether it should
be construed in that way to avoid what otherwise might
justly be regarded as a public calamity, is another ques-
tion. That question however is not before us in this
case for determination. On mature deliberation and re-
flection, we think after reading and considering the 8th
section of article 7, the 8th section of article 4, the 40th
section of article 6 and other articles and sections of the
constitution, and making a just and proper application of
the well settled rules governing in the the construction of
state constitutions and statutes, that prescribing the "man-
ner" in which public officers shall be elected, appointed and
removed, as expressed in the 8th section of article 4 when
- read and considered in connection with article 7, sections
8 and 1 and article 6, section 40 and other sections of
the constitution before cited, includes the agent or per-
son who may appoint as well as the formality with which
it should be done.

Among, others the case of Clark v. Stanley, 66
North Carolina R 59, has been brought to our notice.
We have examined and considered the case. But the

section of the consitution of North Carolina is quoted in the case; and while it is similar in important respects to the 8th section of article 7 of our constitution, it is not altogether similar. The questions do not seem to have arisen in that case that arise here. Whether there were, or are, other sections in the North Carolina constitution which do, or do not, modify or qualify the one quoted, and similar to these in our constitution, which have been cited and discussed here, we are unable to say, as we have not been furnished with a copy of that constitution. In the absence of a copy of the North Carolina constitution, and of knowledge on our part of what contemporaneous practical construction may have been given to the language employed in the section quoted in the report of the case, or to similar provisions by the legislative and executive departments of the government of North Carolia, we feel that we are not authorized to give the case much weight in arriving at our conclusions in this case.

The case of the State of Ohio on relation &c. v. William Kenners and others, contained in 7 Ohio State Reports commencing on page 546 has also been brought before us in argument by the counsel on both sides. It appears in that case that there is a provision in the constitution of the State of Ohio providing that; "*No appointing power shall be exercised by the General Assembly.*" The legislature of Ohio, notwithstanding this provision, conferred by an act, or acts, upon three private citizens, who held no office, the power and authority to appoint certain offices of the state house and of the penitentiary, and the court, in the case cited, decided that the act was unconstitutional and, therefore null and void. But the court held in its opinion, that the question or authority of the legislature to confer the power of appointment to an existing office or officers did not arise in that case, and was therefore not decided. But one of the judges of the court did discuss the ques-

tion in his opinion delivered in the case, and 'that was Judge Swan; and he held and announced these views as a judge, to-wit: "But it is said that, inasmuch as the General Assembly have power to direct by law the manner in which elections and appointments to office shall be made, and may, in the exercise of this power, annex it by law to some existing office, such as the governor *virtute officii,* there is practically no difference between the General Assembly vesting the power in individuals designated by name, as in the laws before us, or annexing the power to an existing office.

This line of argument will not in this case bear the slightest examination; for, if it were true, it would have no application before us. But it has not, perhaps, the usual merit of a false position—plausibility. Let us examine it. If it be conceded that the General Assembly could, or if it be conceded that it could not annex to an existing office, such as the office of governor, with the consent of the senate, the power of appointing directors of the penitentiary, and state house commissioners, it would not in any manner touch the question before us; for the laws we are now considering, instead of annexing to any existing office the power of appointment, etc., have in the first place, provided for a board of appointment, clothed with public functions, and without providing for the manner in which the officers of this board should be filled, have directly elected and appointed the members of the board; thereby exercising, in respect to the board, the appointing power. Whether therefore, there be any difference between the General Assembly creating an office, and appointing the incumbent thereof, or annexing the power of appointment to an office already existing and filled, has no application whatever to the case before us. But it may be proper to inquire whether there is not a difference in this respect; that is whether the General Assembly in fact exercise the appointing power

1873.
June Term

Bridges
v.
Shallcross.

by annexing to an office already existing and filled, the power of making appointments and filling vacancies. If the General Assembly annex to an office already existing and filled additional powers and duties, upon what ground can it be claimed that this is the exercise by the General Assembly of the appointing power? Certainly upon this only, that the General Assembly has enlarged or added to the powers and duties of an existing office. But this is really absurd; for if adding to the duties and powers of existing offices is an exercise of the appointing power, then every new duty required, or power conferred upon any state, county, or township officer must be deemed the exercise by the General Assembly of the appointing power, and forbidden by the constitution. But these falacious positions arise out of misapprehension of what is meant by the appointing power. An office, until filled, is an impersonal thing, an incorporeal hereditament. It is filled by the exercise of the appointing power; and when filled the office and officer both exist. The office itself may by law be enlarged in its powers, or new duties enjoined, without touching the appointment or tenure of office of the incumbent, or his successor. It would, therefore, seem highly probable, although the question is not before us, that the General Assembly could, without displacing or appointing a governor of Ohio, annex to the office of governor the power of appointing directors of the penitentiary, or the duty of performing any other legitimate function. If the general assembly conferred upon the incumbent of the gubernatorial chair official public powers as an individual, so that he would continue to exercise the powers thus conferred, whether he continued to hold the office of governor or not, it would seem quite manifest, to my mind, that the General Assembly created an office in such case, and exercised the appointing power. But these questions are not before us except to comment upon, with a view to aid those who seem to be unable to distinguish between an office and an officer, between offi-

cial powers conferred by the law, upon and annexed to an office, and the individual incumbent or officer." We have quoted thus largely from the opinion of Judge Swan because the opinion is in point in this case, and is able and, as it seems to us, unanswerable.

There is no question directly or necessarily arising in this case as to the power or authority in the legislature to authorize the Board of Public Works to fill vacancies, or as to what is the proper construction to be given to the 9th section of article 7. The appointment conferred upon the complainant here is not to fill a vacancy ; but is an original appointment for a full term.

Under the authorities, principles, facts, and views above stated we are of opinion that the act of the legislature of this State, passed on the 14th day of January 1873, entitled, "An act amending and re-enacting section one of chapter fifty-six of the Code of West Virginia concerning the board public works," and enacting that said section be amended, and re-enacted so as to read as follows: "1. The governor, auditor, treasurer, superintendent of free schools, and attorney general, shall be and continue a corporation under the style of the "Board of Public Works," is not repugnant to the constitution of this State but is valid and binding. And we are also, further, of the opinion that so much of the act passed by the legislature of this State on the first day of April 1873, entitled, "An Act to amend and re-enact sections two, six, seven, fourteen and nineteen, of chapter 163, of the Code of West Virginia," as is directly involved in and applies to this case and especially the parts thereof by which it is enacted that the Board of Public Works shall on the 15th day of April in the year 1873, and every two years thereafter, appoint a superintendent of the penitentiary at Moundsville, whose term of service shall begin on the first day of May next after his appointment, and who shall have the powers and perform the duties of said office prescribed by law, and shall re-

1873.
June Term.

Bridges
v.
Shallcross.

·ceive an annual salary not to exceed $1500, at the discretion of the Board of Public Works, is not repugnant to the constitution of this State but is, and are valid and binding. Both of which said acts of the legislature are mentioned and referred to by the Defendant in his return to the *mandamus nisi* issued and returned in this cause. It is therefore considered by us that the return of the defendant Shallcross, made to the said writ of *mandamus nisi* issued and returned in this cause, is insufficient in law, and that upon the demurrer filed by the Complainant Bridges to the said return, the law is in favor of the complainant and that the said demurrer must be sustained, and that a peremptory *mandamus* do issue in this cause, and that the conplainant Bridges do recover againss the defendant Shallcross his costs about the prosecution of this proceeding in this Court expended.

HOFFMAN, MOORE and PAULL, Judges, concur in the foregoing opinion.