IN THE MATTER OF THE FILLING OF VACANCIES BY THE GOVERNOR.

(1)  *Filling of Vacancy by the Governor.    Railroad Commissioner.*

In case of a vacancy by death occurring in the office of railroad commissioner while the senate is in session, the governor has not the power, with the advice and consent of the senate, either by statute or under the constitution, article VII, section 5, to fill said vacancy, neither has the senate such power after the nomination by the governor has remained on the table for more than three days.

The following opinion was rendered by the justices of the supreme court, to the governor, April 1, 1907.

SUPREME COURT, April 1, 1907.

*To His Excellency James H. Higgins, Governor of the State of Rhode Island and Providence Plantations:*

We have received from your excellency a request for our opinion upon the following questions, viz.:

"1.   In case of a vacancy by death occurring in the office of Railroad Commissioner while the Senate is in session, has the Governor, with the advice and consent of the Senate, the power to fill said vacancy?

"2.   In case of a vacancy by death occurring in the office of Railroad Commissioner while the Senate is in session, has

the Senate the power to fill said vacancy after the nomination of the Governor for said office has remained on the table for more than three days?

"3.   In case of a vacancy by death occurring in the office of Railroad Commissioner while the Senate is in session, has the Governor, under Section 5, Article VII, of the Constitution, the power to fill said vacancy?   If so, until what time does his appointee hold the office?

"4.   In case of a vacancy by death occurring in the State Board of Agriculture while the Senate is in session, has the Governor, with the advice and consent of the Senate, the power to fill said vacancy?"

We are of the opinion that all these questions must be answered in the negative.

We find nowhere in the statutes any provision for the appointment of a railroad commissioner or a member of the State board of agriculture to fill a vacancy occurring in either of these offices by the death of the incumbent while the senate is in session.

After the adoption of article XI of the Amendments to the Constitution, November 6th, 1900, it became necessary to change the terms of certain State officers to conform to the new provisions in regard to the session of the General Assembly, and chapter 809 of the public laws was passed January 29, 1901, with that intention.   Among the offices affected were those of railroad commissioner and member of the State board of agriculture.

The provisions of the act with respect to the railroad commissioner are as follows:

"SEC. 41.   Section 1 of Chapter 187 of the General Laws is hereby amended so as to read as follows:

"SECTION 1.   There shall be a railroad commissioner who shall perform the duties enumerated in this chapter and such others as are or may be from time to time provided by law. The person holding that office at the passage of this act shall continue to hold the same for the remainder of the term for which he was appointed.   At the January session of the

general assembly in the year A. D. 1901, and in each third year thereafter, the governor, with the advice and consent of the senate, shall appoint some person to be railroad commissioner to succeed the person then holding such office; and the person so appointed shall hold his office until the first day of February in the third year after his appointment. Any vacancy which may occur in said office when the senate is not in session shall be filled by the governor until the next session thereof, when he shall, with the advice and consent of the senate, appoint some person to fill such vacancy for the remainder of the term."

It is plain that the first part of the section provides for an appointment to the full term of the office, i. e., for three years, beginning February 1st, in every third year from 1901. The event here provided for is not a vacancy, but the approaching expiration of the term. The last clause of the section provides for the filling of a vacancy in the office after the term has begun, but only if such vacancy occurs when the senate is not in session. There is no provision whatever for filling a vacancy which occurs while the senate is in session.

Similar provisions with regard to vacancies in the membership of the Rhode Island State Board of Agriculture are found in section 24 of this chapter, as follows:

"At the January session of the general assembly in each year the governor, with the advice and consent of the senate, shall appoint some persons to be members of said board to succeed the members whose terms will next expire; and the members so appointed shall hold their offices until the first day of February in the second year after their appointment. Any vacancy which occurs in their number when the senate is not in session shall be filled by the governor until the next session thereof, when he shall, with the advice and consent of the senate, appoint some person to fill such vacancy for the remainder of the term."

Here, again, the first clause quoted relates exclusively to an office the term of which has not begun, and the last clause provides only for filling a vacancy which occurs when the senate is not in session.

Section 62 of the same chapter relates only to the filling of vacancies which have occurred while the senate was not in session and which have been temporarily filled by the governor; and section 63 relates only to such appointments as the governor "is required by law to make" at the January session, which are, in fact, all appointments for full terms or appointments under section 62 to fill vacancies which had been temporarily filled when the senate was not in session. These sections only give the senate power to act in cases where the governor has acted or neglected to act when his action is required by other sections of the chapter. These sections do not deal with the case of a vacancy occurring while the senate is in session any more than those we have already considered.

This deficiency in chapter 809 seems to have been contemplated by the General Assembly of 1905, and it was partially supplied by Public Laws, chapter 1248, passed May 11, 1905, as follows:

"Section 1. Whenever any officer elected by the grand committee, appointed by the governor, with the advice and consent of the senate, or elected by the senate, shall resign his office during a session of the general assembly, to take effect immediately or at some later date before the next meeting of the general assembly, the vacancy which will occur upon the taking effect of such resignation may be filled at such session, for the unexpired term of such office, in the manner provided by law for the election or appointment of such officer for a full term."

This law, however, only provides for a vacancy occurring by resignation, not one caused by death or some other cause, and the contingency supposed by your excellency's questions is still unprovided for by statute.

The provision of the constitution relating to the filling of vacancies in State offices remains to be considered.

Article VII, section 5, referring to the governor, is as follows: "He may fill vacancies in office not otherwise provided for by this constitution or by law, until the same shall be filled by the general assembly, or by the people."

This language does not embody the announcement of any great principle of right which might lead us to expand its application beyond its plain tenor. It is only a power given to the executive for general convenience in case some other custodian of it has not been provided, and it is only for a temporary purpose—until the normal elective power shall act. At the time the constitution was adopted substantially all State officers of permanent tenure were either elected by the General Assembly or by the people; the governor had the appointment of the commissioner of the Indian tribe, commissioners of deeds residing in other states of the Union, and special commissioners to examine State banks. Appointment by the governor with the advice and consent of the senate and election by the senate, except of its own officers, were unknown.

The section obviously applies to vacancies occurring in offices to which incumbents are elected by the people, or by the General Assembly, as it specifies the term of appointment in words which are applicable to such offices only. If we were to construe this section as conferring upon the executive the power of appointment in the cases under consideration we should be unable to find in the section any answer to your excellency's question as to the term of office of the appointee, unless we could enlarge also by implication the power of the senate to fill the vacancy and terminate the appointment of the executive when the senate should act; but we think such a construction would go far beyond any meaning which can be legitimately deduced from the text and would be an attempt to stretch its provisions to include circumstances not contemplated by those who framed it.

WILLIAM W. DOUGLAS,
EDWARD C. DUBOIS,
JOHN TAGGARD BLODGETT,
CLARKE H. JOHNSON,
C. FRANK PARKHURST.

THE following opinion was delivered to the Honorable Senate by the Justices of the Supreme Court, April 21, 1908, in the matter of

## THE ELECTION OF OFFICERS BY THE SENATE.

Pub. Laws cap. 809, §§ 62 and 63, passed at the January session, 1901, respecting the election of officers by the senate, is constitutional.

The offices affected by this statute are not offices created by the constitution or specifically mentioned therein, but they are offices which have been created from time to time by the General Assembly.

The power of selection of officers resides originally in the people, who may provide by constitution how the power shall be exercised or they may leave to the legislature to provide by law for the selection of such officers by such instrumentality, or in such manner, as they decide. This power of appointment or selection is a function of either the executive, legislative, or judicial branch only when made so by law, so that the power of the senate to elect officers can not be denied on the ground that such power is an executive function.

Cons. R. I. article XI of amendments, by omitting the general elective power conferred upon the grand committee by Cons. R. I. article VIII, § 3, and by providing for the election by the grand committee of certain specified State officers in certain contingencies, intended to place the two houses separately and the grand committee upon the same footing with respect to the capacity to elect officers not specially designated to be chosen by either.

SUPREME COURT,

April 21, 1908.

*To the Honorable, the Senate of the State of Rhode Island and Providence Plantations:*

We have received from your honorable body a resolution requesting our opinion upon the following question:

"Are the provisions of law respecting the election of officers by the Senate contained in sections 62 and 63 of Chapter 809 of the Public Laws, passed at the January Session, 1901, constitutional?"

These sections are as follows:

"SEC. 62. Whenever at the commencement of any session of the general assembly there shall be in office any person appointed by the governor, when the general assembly was not

in session, to hold office until the next session thereof, and the governor shall not within seven days after the general assembly shall be in session nominate some person as required by law to fill such vacancy for the remainder of the term, or whenever the senate shall have been in session for three days after the governor has made such nomination and shall not have advised and consented to the same, the senate may elect some person to fill such vacancy for the remainder of the term.

"SEC. 63. Whenever at the January session of the general assembly, the governor shall not in the month of January make any of the appointments to office which he is required by law to make at said session, or whenever the senate shall have been in session for three days after the making of any such appointment by the governor and shall not have advised and consented to the same, the senate may elect some person to the office in respect to which such appointment shall not have been made or such advice and consent has not been given."

The effect of these sections is to require that certain officers shall be appointed by agreement of the governor and the senate; and if such agreement is not signified within a certain time, then that the senate may appoint them.

The question may be divided as follows:

Is a law which gives the power to appoint certain officers to the governor and senate jointly in violation of the constitution?

Is a law which gives to the senate the power to appoint certain officers in violation of the constitution?

The offices affected by the statute are not offices created by the constitution or specifically mentioned in that instrument; they are offices which have been created from time to time by the general assembly.

The question does not specify any clause of the constitution which this statute may be claimed to violate.

We suppose the question is prompted by a doubt whether the power of appointment to office is not the exclusive function of the executive branch of the government. It is not so prescribed or treated by the constitution; nor is it the general

practice of this or the other States of the Union so to consider it.    The power of selection of the officers of the commonwealth resides originally in the people.    They may provide, by the constitution which they adopt, how the power shall be exercised, or they may leave to the legislature, as their representatives, to provide by law for the selection of such officers, by such instrumentality and in such manner as in their opinion will secure the best service to the public.    The power of appointment or selection to office is a function of either the executive, legislative, or judicial branch only when it is made so by law. The power of the senate, therefore, to elect the officers in question can not be denied on this ground.    But there are other constitutional provisions which may be alleged as forbidding the exercise by the senate of the power of election of State officers either by itself or in conjunction with the governor.

As the constitution read before the adoption of the XI Article of Amendments, we think there was great force in the contention that the senate could exercise the general power of election only in conjunction with the house of representatives in grand committee.    The Articles of the Constitution bearing upon the question are Articles V and VI, which prescribe the constitution of the house and senate respectively and empower them to elect certain officers whose duties appertained to the organization and administration of each house.    Article IV, section 10, continues to the general assembly the powers they had previously exercised, "unless prohibited in this constitution." That amongst these reserved powers was that of the election of State officers which might be created by law is plain from Article VIII, section 3, which reads as follows:  "The names of the persons voted for as governor, lieutenant-governor, secretary of state, attorney-general, and general treasurer shall be placed upon one ticket; and all votes for these officers shall in open town or ward meetings, be sealed up by the moderators and town clerks and by the wardens and ward clerks, who shall certify the same and deliver or send them to the secretary of state; whose duty it shall be securely to keep and deliver the same to the grand committee, after the organization of the two houses at the annual May session; *and it shall be the duty*

*of the two houses at said session, after their organization, upon the request of either house, to join in grand committee, for the purpose of counting and declaring said votes, and of electing other officers."*

The "other officers" here referred to undoubtedly meant such officers as by special direction of the constitution or by law were to be elected by the general assembly. As the constitution then stood the senate and the house were given power to elect their own officers (excepting in the case of the senate, the official presiding officers and secretary) and the senate and house of representatives in grand committee but not otherwise were given the general power of election. The duties of the senate and the house of representatives as defined by the constitution as separate bodies with certain specified exceptions were exclusively legislative. As a general assembly in grand committee they had no legislative authority, but their capacity to elect State officers not otherwise provided for by the constitution was general and unlimited.

It may well be said that with no general power of election given to either house and with this ample capacity conferred upon the grand committee, all power of election by the general assembly should be held to reside in the grand committee. It is one of the undoubted functions of the legislature, under our constitution, to create from time to time such offices as may be necessary to administer the government of the State.

It is not doubted either that the general assembly by law may delegate legislative power of local and limited extent to municipal corporations and the like, or that it may invest officers or boards which it may create with administrative powers appropriate to the duties which it imposes upon them; and so it may confer upon the executive or the judiciary, or the people of a district, or upon officers or boards of its own creation, the power to appoint officers or subordinates not specially provided for by the constitution; or it may retain to itself the power to make such appointments. But while the provisions above referred to were a part of the constitution, it is not clear that the elective power which was retained by the general assembly could be exercised otherwise than by the

two houses in grand committee.   To alter the method of election so plainly set forth in the constitution by giving to one constituent part of the grand committee (and that the lesser in number of members) the full power of election which the constitution had given to both bodies assembled in grand committee would seem to be a subversion of the system of government which the people had adopted.   Such a change could not be effected by a statute, but if desirable must be secured by amendment to the constitution, as the taking of the pardoning power from the general assembly and placing it in· the governor, by and with the consent of the senate, was effected by Article II of the amendments adopted November, 1854.   Such appears to us to have been one of the objects of Article XI of the amendments adopted November, 1900.   The principal changes in our system of government effected by this amendment were to abolish the May session of the general assembly, provided for by Article III of the amendments, and to substitute therefor a session beginning in January at Providence, to change the date of the annual election from April to November, to provide for an election by the grand committee of a governor and lieutenant-governor in case both offices should become vacant, and to repeal the express power to elect "other officers" given to the grand committee by section 3 of Article VIII.

Section 3 of Article XI of the amendments is as follows: "When the governor elect shall die, remove from the state, refuse to serve, become insane, or be otherwise incapacitated, the lieutenant-governor elect shall be qualified as governor at the beginning of the term for which he was elected.   When both the governor and lieutenant-governor elect, or either the lieutenant-governor, secretary of state, attorney-general, or general treasurer elect, are so incapacitated, or when there has been a failure to elect any one or more of the officers mentioned in this section, the general assembly shall upon its organization meet in grand committee and elect some person or persons to fill the office or offices, as the case may be, for which such incapacity exists or as to which such failure to elect occurred.   When the general assembly shall elect any of

said officers because of the failure of any person to receive a plurality of the votes cast, the election in each case shall be made from the persons who received the same and largest number of votes."

The whole article provides, indeed, for the election by the grand committee of certain specified officers in certain contingencies, but the clause conferring the general elective power is omitted. The distinctive grant of this power to the two houses assembled in grand committee no longer exists. The grant of elective power to the joint body as the grants of elective power to each house is special and restricted. The inference is not illogical that it was the intention of the people to place the two houses separately and the grand committee upon the same footing with respect to the capacity to elect officers not specially designated to be chosen by either. If the right to elect their own officers given to each house is to be construed as a restriction and not as the specification of a grant, why must not the right to elect certain specified officers given to the grand committee be so considered?

But the position is not tenable that it is not competent for the general assembly by law to place the election of any State officers not provided for by the constitution in the grand committee. If, therefore, the election of the officers in question may be entrusted by law to the grand committee, we think it may be so conferred upon the senate; and if upon the senate alone, it follows that it may be upon the senate jointly with the governor.

Such has been the cotemporary and continuous interpretation of the provisions of the amendment from the time of its adoption, some thirty statutes having been passed which depend for their validity upon this construction of the constitution.

If the reasons which we have thus briefly adduced are not absolutely conclusive they can not fail, it seems to us, to sustain that reasonable doubt, which, according to the rule announced by Cooley on Const. Lim. *p. 182, and adopted by Chief Justice Durfee in *State* v. *District of Narragansett,* 16 R. I. 424, 440,

ought to restrain a court from declaring an enactment of the legislature unconstitutional.

We therefore answer the question in the affirmative.

WM. W. DOUGLAS,
EDWARD C. DUBOIS,
C. FRANK PARKHURST.

———

I do not approve, in its entirety, of the reasoning of the opinion of the majority of the justices.

I can not agree that because section 3 of article XI of the amendments provides for the election by the grand committee of certain specified officers, in certain contingencies, at the annual session, and omits the declaration which was contained in section 3 of Article VIII that it shall be the duty of the two houses at said session, after their organization, upon the request of either house to join in grand committee for the purpose "of electing other officers," therefore it was the intention of the people to place the two houses separately and the grand committee upon the same footing with respect to the capacity to elect officers not specially designated to be chosen by either.

In my opinion the capacity of the senate to receive and exercise the power of election was neither increased nor diminished by the adoption of said amendment. A consideration, however, of the provisions of the constitution in the light of the legislative construction which has prevailed both before and since the adoption of said amendment, and which is fully set forth in the majority opinion and in that of Mr. Justice Blodgett, has raised in my mind a reasonable doubt upon the question of the constitutionality of the statutes under consideration. In passing upon the constitutionality of a statute, a reasonable doubt must be resolved in favor of constitutionality. I therefore concur in the conclusion reached by the other justices.

CLARKE H. JOHNSON.

*To the Honorable the ·Senate of the State of Rhode Island and Providence Plantations:*

The request of your honorable body for an opinion upon the following question, viz.: "Are the provisions of law respecting the election of officers by the Senate contained in. sections 62 and 63 of Chapter 809 of the Public Laws, passed at the January Session, 1901, constitutional?" calls for a consideration of the constitution of the State in respect of those of its provisions which the sections in question may be supposed to contravene.

By the provisions of section 3 of article VIII of the constitution, as it stood when adopted, it was provided as follows: "The names of the persons voted for as governor, lieutenant-governor, secretary of state, attorney-general, and general treasurer shall be placed upon one ticket; and all votes for these officers shall, in open town or ward meetings, be sealed up by the moderators and town clerks and by the wardens and ward clerks, who shall certify the same and deliver or send them to the secretary of state; whose duty it shall be securely to keep and deliver the same to the grand committee, after the organization of the two houses at the annual May session; and it shall be the duty of the two houses at said session, after their organization, upon the request of either house, to join in grand committee, for the purpose of counting and declaring said votes," (for governor and general officers) "*and of electing other officers.*" It is not denied that this authorized and required the election of such "other officers" to be made in grand committee.

By the adoption of the eleventh amendment on November 6, 1900, section 3 of Article VIII was specifically repealed by section 12 thereof.

The only constitutional requirements that elections shall now be held in grand committee are to be found in Article IV, section 18, as to United States Senators; Article X, section 4, as to·judges of the Supreme Court; and sections 3, 4, and 5 of Article XI of amendments, in case of the death, removal from State, or other incapacity of the governor, lieutenant-governor, secretary of state, attorney-general, and general treasurer only;

and the duty to join in grand committee for the election of "other officers" is no longer imposed by the constitution. Section 7 of Article XI of amendments is as follows: "In elections by the general assembly in grand committee the person receiving a majority of the votes shall be elected. Every person elected by the general assembly to fill a vacancy, or pursuant to section 3 of this Article, shall hold his office for the remainder of the term or for the full term, as the case may be, and until his successor is elected and qualified." But this is a mere definition that a majority of votes is necessary to an election in grand committee, although only a plurality is sufficient at the polls, and a definition of the term of office conferred by such election.

This change in the fundamental law thus specifying and enumerating the officers whom the grand committee elect, if it does not deprive the general assembly of constitutional authority for electing such "other officers" in grand committee, unquestionably relieves the general assembly of the constitutional obligation to proceed in that manner and leaves to the legislature to provide by statute for the election of such "other officers," inasmuch as the constitution no longer indicates the manner of their choice and the sections of the chapter in question passed at the first session of the general assembly succeeding the adoption of the eleventh amendment are the contemporaneous expression of the judgment of the legislature as to the change thereby effected.

From a schedule furnished us by the secretary of state, it further appears that there are thirty State boards, commissioners, and officers within the purview of the sections of the statutes referred to in the questions submitted.

An examination of the legislation enacted since the adoption of the eleventh amendment shows that at the first session of the general assembly thereafter, the power to confirm or to reject the nominations of the governor was either originally conferred on the senate, or was reconferred on that body by twenty-two specific and separate amendments to existing law covering twenty-two of these cases and comprising every one of these State boards, commissioners, or offices theretofore

existing; that the tenure of the members of one such board originally created at that session was so established, and that seven new State boards or commissions have since been created by successive legislatures, in each instance with like tenure. This summary thus still further indicates in every one of these thirty cases not alone the contemporaneous but also the continuous judgment of successive legislatures as to their constitutional competency so to provide.

Moreover, by the statute then in force (Gen. Laws cap. 24, sec. 6), it was provided, in accordance with this constitutional requirement, that certain officers should be chosen by election, at the May session, in grand committee, the section concluding with these words: "and such other officers as are now, or may be required by law to be elected in grand committee."

At the first session after the adoption of the eleventh amendment, this provision was changed (Pub. Laws cap. 809, sec. 2), and while it was therein provided that certain enumerated officers should be elected in grand committee, the words above quoted were omitted, thus leaving no general requirement, either constitutional or statutory, that elections by the general assembly must be held in grand committee of the two houses.

Prior to the adoption of the constitution substantially all the officers not elected by the people were elected by the general assembly; the election of militia officers was, however, confirmed by the "governor and council," or senate, and the governor had the power of appointment in only three cases— the Commissioner of the Narragansett Indians, special commissioners to investigate savings banks, and commissioners of deeds in other States.

It not unnaturally followed that the constitution substantially contained these provisions, and thus we find that no power of appointment is vested in the governor, save to fill vacancies temporarily existing, and that, with the exception of the three classes above cited, substantially all State officers were then normally elected either by the people or by the legislature in grand committee.

Later, as new offices were created, it was provided that in most cases they should still be filled by the general assembly

in grand committee, in some instances by the governor alone, and in some instances by the governor with the advice and consent of the senate. Almost forty years ago, the senate was given by statute the right to reject the governor's nominees for certain offices, among which may be mentioned the members of the Board of State Charities and Corrections, a board which was created in 1869.

It needs no argument to demonstrate that this division of the appointing power between the governor and senate, in which the ultimate decision rests with the senate, is essentially of the same nature as the selection by the senate without a prior nomination by the governor. If one method is obnoxious to the constitution, the other is equally so, and they must stand or fall together, since the constitution does not in express terms confer upon the governor even the right of nomination, subject to the confirmation of the senate, much less the sole power of appointment.

The constitution, it is true, distributes the powers of government into three departments, "the legislative, executive, and judicial," but in Article VII vests in the governor only "The *chief* executive power of the State," which is evidently less than all of such power.

Thus the Const. U. S. Art. II, Sec. 1, vests "The executive power" in the president, but it was never supposed that this declaration vested the president with the appointing power which, after long and earnest debate, was conferred upon the chief executive of the nation in express terms. U. S. Const. Art. II, Sec. 2.

In the case of a confirmation by the senate the senate determines finally whether A., whose name has been presented to it, shall or shall not fill a certain office; and if A. is rejected, whether other individuals in succession shall be appointed until a nomination is made which is satisfactory to the senate. In the case of an election by the senate, that body makes the selection of the incumbent with no greater power of finality, indeed, but untrammeled by a requirement that its choice shall be limited to one person at a time.

The condemnation of either method must rest either upon the

incapacity of the senate to accept or the incompetency of the legislature to bestow on it the power to reject the governor's nomination or the power to make the selection without the executive nomination. Indisputably, the senate may share with the house of representatives the power to elect in grand committee, but with a senate of thirty-nine members and a house of seventy-two members, it is obvious that the power of election must always rest with the house of representatives in such a case.

It will not be contended that there is any constitutional restriction upon conferring the whole power of appointment by a statute upon the governor alone, and if this may be done, where is there to be found in the constitution any restriction upon the assembly which prevents it from conferring that function on him *sub modo*, with limitations and qualifications, or on certain conditions such as requiring a nomination to be made within a fixed period, and retaining the right to share the power with the executive by a provision reserving the ultimate decision of the fitness of his nomination by one of the integers of which the grand committee is composed? And this is merely a restriction of the confirming body to individual names which, as we have seen, differs in degree rather than in kind from an unrestricted choice.

In common with many other constitutions, our own constitution does not make appointment to office an executive function; and if it may be conferred on the executive by statute it is difficult to find the express constitutional prohibition against conferring the same power on other depositaries, as, for example, upon a branch of the legislative department.

Familiar instances of this delegation of power to fill a State office are not wanting in our history.

It will not be disputed that the legislature has an unquestioned right to create municipal corporations and to confer upon such corporations executive, legislative, and judicial functions. Thus, from the foundation of the State, now more than two hundred and seventy years, every town council in the State has been constituted a court of probate. In many towns and in all the cities probate judges are elected by the

town and city councils, respectively, and in every town they
may be so elected.   Will it be contended that at no time since
the adoption of the present constitution could the legislature
constitutionally delegate the power to appoint a probate judge
to a town or city council?   Through these courts of probate
all the real and personal property of the State, now amounting
to almost five hundred millions of dollars, passes every gen-
eration.   Are all the lands to which title is claimed by will and
all personal estates administered in the last sixty years in these
courts held only by a prescriptive and possessory title and by
the authority of courts acting *de facto* and not *de jure?*   Surely
it will not be contended that these courts do not exercise the
judicial powers of the State, or are of merely local concern.
Will it be contended that the governor and senate can not
constitutionally appoint the police commissioners of Tiverton,
although the mayor and aldermen of Providence and like
officials in Newport may appoint police commissioners with
the same powers and duties?   Is the city council of Providence
constitutionally competent to elect a board of canvassers and
registration for that city while the governor and senate are
constitutionally incompetent to appoint the members of the
State returning board with similar duties?   Or will it be con-
tended that while the legislature can constitutionally incor-
porate the town of Narragansett, a half century after the
adoption of the constitution, and vest in its town council the
power to declare and enforce quarantine, that the governor
and senate can not constitutionally appoint the members of
the State board of health, who are also charged with the same
duty in certain exigencies?

Nor are the provisions in question answerable to the charge
of being irrepealable legislation.   Whether the provisions are
wise or otherwise is not our concern, since the questions sub-
mitted are questions not of policy but of power.   It is sufficient
to say that there is nothing in the terms of the act which pur-
ports to render it irrepealable.   If it be objected that the
power will not be voluntarily surrendered by the senate, it
may be replied that this power was voluntarily conferred by
the house of representatives and that it is always in the power

of either house to refuse to concur in the repeal of existing law in any case. Indeed, the only object of more than one house is that one body may act as a check upon the other. In either case the appeal is to the people at the polls.

The decisions in other States furnish assistance on this question in most instances only by analogy as showing the different depositaries of this power of appointment elsewhere. In some States constitutional provisions are found differing from those contained in our constitution, and the power of appointment of State officers has been vested in other depositaries than those now under consideration. In the constitutions of all of them, however, there is the same distribution of the powers of government in three departments—the legislative, the executive, and the judicial. In some the constitution has authorized certain officers to be appointed in such manner as may be provided by law.

In Alabama (*Fox* v. *McDonald*, 101 Ala. 57), the appointment of police commissioners for the city of Birmingham by a judge of probate was held to be constitutional, although the constitution contained this restriction on the several departments of the government: "No person, or collection of persons, being of one of those departments, shall exercise any power properly belonging to either of the others, except in the instances hereinafter expressly directed or permitted," and this was not within the exception.

Under such a provision the appointment of State officers by private individuals has been more than once upheld. Thus, the Court of Appeals of New York (*Sturgis* v. *Spofford*, 45 N. Y. 446) sustained the constitutionality of a statute providing for the appointment of a pilot commissioner (a State officer), by the Chamber of Commerce of New York and the presidents of certain marine insurance companies, comprising the board of underwriters of that city, and who were private individuals. The supreme court of California (*In re Bulger*, 45 Cal. 553) sustained the appointment of a State officer, a fire commissioner, by the agents of certain fire insurance companies in San Francisco, comprising a voluntary association known as the board of underwriters.

In *Overshiner* v. *State*, 156 Ind. 187, decided in 1900, the appellant was convicted of practicing dentistry without a license or certificate of registration from the State board of examiners, three of whose members were appointed by "the Indiana State Dental Association;" and the court said (p. 191): "It is claimed that the statute must fail for the reason that the legislature has no constitutional warrant for bestowing its police power upon a private corporation to be by it exercised upon the citizens of the State. We perceive no reason why a corporation, such as the one complained of, may not prove itself a repository of power, as safe and salutary as an individual. The corporation is composed of practicing dentists, organized for the promotion of scientific knowledge and skill in the practice of the profession of dentistry, and which association thus stands in an intimate and well informed relation to the subject, and possessed of a peculiar interest in the successful administration of the law. It is difficult to conceive of an appointing power with higher qualifications, or likely to be swayed by more laudable motives, and that it is an organization of persons mutually interested in the enforcement and proper administration of the law surely furnishes no reason for its condemnation. . . . We hold, therefore, that the General Assembly in conferring upon the state dental association power to appoint three members of the state board of dental examiners did not transcend its constitutional power, and that appointments to said board of examiners by said association are valid. Judgment affirmed."

Similar instances of legislation authorizing the appointment of State officers by other than public officers or bodies are to be found in this State. Two examples may suffice.

The State Board of Agriculture is one of the State boards subject to the provisions of the sections of the statute under question as to those of its members who are appointed by the governor, "with the advice and consent of the senate." It now has, and has long possessed, extensive and varied powers. By section 7 of chapter 98, Gen. Laws, it "may make all necessary regulations for the prevention, treatment, cure and extirpation" of any contagious disease, or disease dangerous to the

public health, prevailing among cattle or other domestic animals "and every person who shall fail to comply with any regulation so made shall be fined not exceeding three hundred dollars or be imprisoned not exceeding one year." By section 8 of the same chapter such regulations of this board "shall supersede the regulations made by the authorities of the several towns and cities upon the same subject," and the operation of the latter is suspended meanwhile. By section 3 of said chapter it is provided that "every person who shall bring, transport or introduce any cattle or other domestic animal into the state, after said board or *any one of them* shall have issued an order forbidding the same, . . . shall be fined not exceeding three hundred dollars for every such offence," and further providing that "the introduction of each animal shall be deemed a separate and distinct offence."

In addition to these large powers many others are given to this board, which it is not necessary to enumerate.

In the last fiscal year the amount appropriated by the legislature for its purposes was the sum of twenty thousand dollars. Its membership is now composed as follows (Pub. Laws cap. 809, sec. 23): "The Rhode Island state board of agriculture shall be constituted as follows: the governor, lieutenant-governor, and secretary of state shall be *ex-officio* members of said board; one member shall be appointed from and by the board of managers of the Rhode Island College of Agriculture and Mechanic Arts; *one member shall be appointed from and by each of the agricultural societies which receive an annual bounty from the state; one member shall be appointed by and from the Rhode Island State Grange, Patrons of Husbandry;* and three members shall be appointed by the governor with the advice and consent of the senate."

And this delegation of power to certain agricultural societies to appoint State officers has existed during the twenty-three years which have elapsed since the original creation of the board in 1885 (Pub. Laws cap. 507, January session, 1885), unquestioned in any judicial proceeding so far as we are advised, and evidencing meanwhile the judgment of successive legislatures as amendments of a similar nature have been made,

as to the constitutional right to so delegate such power of appointment. Will it be contended that the governor and senate or the senate alone are constitutionally incompetent to appoint members of the same State board of which the agricultural societies aforesaid may appoint certain members? And we have seen the constitutionality of such latter method of appointment has been frequently upheld in other jurisdictions.

By the provisions of cap. 1466, Pub. Laws, there is created the Metropolitan Park Commission of Providence Plantations, whose jurisdiction extends to and may be exercised in three cities and eight towns in three counties of the State. By section 4 of the act it may "take in fee simple or otherwise, in the name and for the benefit of the State, by purchase, gift, or devise, or by eminent domain in such manner as may hereafter be provided by the general assembly, lands, and interests, estates and rights therein, for the public use within said metropolitan park district," with the power to make rules and regulations relative to the control and use thereof, the violation of which is punishable by a fine not exceeding twenty dollars. Its membership is composed of certain *ex-officio* members, including "the president of Brown University, the president of the Board of Trade of Providence, the director of the Rhode Island School of Design, the president of the Providence Art Club, the president of the Rhode Island Chapter of the American Institute of Architects, all *ex-officio*, together with four members and representatives of the Public Park Association to be annually elected by said association at its annual meeting or any adjournment thereof."

The manner in which any office may be filled, in the absence of constitutional provision, is purely a matter of statute. While the duties of the office may be either executive, judicial or legislative, it does not follow that the choice of the instrumentality to perform those duties is a prerogative of either department of the government, and yet they may not infrequently be exercised by different departments of the government with the utmost propriety. Thus to the Board of State Charities and Corrections are entrusted the charge of the

State prison and other penal and reformatory institutions of the State. This board exercises the function of enforcing restraint upon all the criminals under their charge, and this is a purely executive function. The duties of the State returning board are widely different. Upon their finding depends, in the first instance, the right to participate in the organization of the legislative department, and their certificate is made by the statute the final and conclusive evidence of the election of the chief executive. Powers such as these are clearly judicial in their nature, and we should search the constitution in vain to discern any prohibition in terms or any violation of its spirit had the appointment of this board been vested in this court.

But again, the functions of the State board of health differ from either of the two preceding. Its duty is to protect the health of the community, and as new disorders arise or new remedies are discovered or new methods of treatment are found beneficial, it is their province to change their rules and requirements from time to time accordingly, and this is clearly analogous to a legislative function.

If the appointment of the first were vested in the executive department, of the second in the judicial department, and of the third in the legislative department acting in grand committee, it will hardly be contended that such a provision would be unconstitutional. And if the law-making power may thus select different depositaries of the power of appointment in these cases, where is the prohibition to be found in the constitution restraining it from providing a still different depositary in the case of other State boards whose duties are not so readily classified as these former? Can it then be said that the constitution by an implied prohibition restrains the legislature from authorizing either house to merely select the instrumentality for carrying into effect the legislative will as expressed by the concurrent act of the two houses in the law creating the duties of the office?

In *Fox* v. *McDonald, supra* (p. 74), it was held as follows: "The truth is, that the power of appointing or electing to office does not necessarily and ordinarily belong to either the legis-

lative, the executive or the judicial department. It is commonly exercised by the people, but the legislature may, as the law-making power, when not restrained by the constitution, provide for its exercise by either department of the government, or by any person or association of persons whom it may choose to designate for that purpose. It is an executive function when the law has committed it to the executive, a legislative function when the law has committed it to the legislature, and a judicial function, or at least a function of a judge, when the law has committed it to any member or members of the judiciary."

We have seen that the legislature has for many years delegated the selection of a probate judge, who is unquestionably a State officer, in towns, to bodies of not less than three nor more than seven men elected by the voters generally and organized as town councils. In the city of Providence the probate judge is elected by a body composed of forty councilmen and ten aldermen, and composing the city council, all of whom must be taxpaying voters resident in the wards which they represent and who are chosen by a special and limited electorate of less than one-half the general electorate of the city, composed of taxpayers only, and from which the registry voters are excluded, and which is presided over by a mayor in whose election registry voters participate. If these limitations and restrictions may be constitutionally imposed and the power of electing a State officer may be granted to these representatives of the people of each city and town separately, organized as town and city councils, respectively, and possessing legislative power to no small degree, shall it be said that the election of other State officers may not be constitutionally vested in a body of thirty-nine men, each one of whom is elected by the general electors of the same towns and cities and representing in their collective capacity all the cities and towns, and with the lieutenant-governor, all the people of the State, as does the senate? If this be so, it follows that the representatives of the people of the State, organized as the senate and the house of representatives, are the only representative political bodies known to our law on whom such

power cannot be conferred. Indeed, the senate may be said to be the single body, inasmuch as we have seen that in elections in grand committee the choice of those representatives of the people who compose the house of representatives must always, owing to their numerical preponderance, prevail over the unanimous opposing vote of the senate.

The question as to the competency of the legislature to confer upon the senate the power of rejecting the governor's nomination to office came before the supreme court of North Dakota, in *State* v. *Boucher*, 3 No. Dak. 389, and was sustained, the court saying, upon a motion for rehearing (p. 403): "Constitutional provisions empowering the governor to appoint officers by and with the advice and consent of the senate are found in many of the states, and always in the article defining the powers of the executive; yet such provision is wanting in the constitution of many of the western states, among which we may mention, in addition to our own state, Wisconsin, Michigan, Missouri, Kansas, and Iowa. While in each of these states the executive power is vested in the governor, yet their statute books are full of instances where offices have been created and made appointive by the governor 'by and with the advice and consent of the senate.' The constitutionality of these provisions has never been doubted in those states, so far as we know. We think it clear that the absence of that provision from our constitution has no effect whatever upon the power of the legislature to direct that appointments be confirmed by the senate."

The reason advanced by the court is as follows: "Is the senate precluded from participating in the appointing power by reason of the exclusive executive nature of that function? Counsel for appellants, in discussing this point, lose sight of one very important distinction. The legislative department, as such, has not sought to exercise or to participate in exercising the appointing power. It has simply designated certain existing officers, to wit, the senators, who should thus participate. Much of the labor of counsel is lost in this case by their failure to make this distinction, as will appear when the

cases are examined." And see *Bridges* v. *Shallcross*, 6 W. Va. 562, 596.

That every reasonable presumption should be made in favor of the constitutionality of a statute has been repeatedly declared to be the duty of the court in numerous decisions. In *State* v. *District of Narragansett*, 16 R. I. 424, Durfee, C. J., says (p. 439): "The question of constitutionality is distinct from the question whether a statute, in its operation as a law, is likely to work well or ill, the latter question being a purely legislative question with which the courts have no concern. The courts concede to state legislatures a legislative power which is limited only by the constitution, and they are therefore careful not to declare a statute unconstitutional until they are clear that it is so. They assume that the legislators, being bound by their oaths to support the constitution, consider, when any act is proposed for passage, whether it can be constitutionally passed, and do not vote for the passage of it until every doubt has been quieted. In this view a becoming deference to the legislature inculcates caution. 'The question whether a law be void for its repugnancy to the Constitution,' says Chief Justice Marshall, 'is at all times a question of much delicacy, which ought seldom, if ever, to be decided in the affirmative in a doubtful case.' *Fletcher* v. *Peck*, 6 Cranch, 87, 129. The rule generally laid down is, that statutes should be sustained unless their unconstitutionality is clear beyond a reasonable doubt. A reasonable doubt is to be received in favor of the legislative action, and the act sustained. Cooley on Constitutional Limitations, *182, and cases cited. 'Before an act is declared to be unconstitutional it should clearly appear that it cannot be supported by any reasonable intendment or allowable presumption.' *People* v. *Supervisors of Orange*, 17 N. Y. 235, 241. 'All intendments favor constitutionality.' *Crowley* v. *State of Oregon*, 11 Oregon, 512. 'Courts will approach the question with great caution, examine it in every possible aspect, and ponder upon it as long as deliberation and patient attention can throw any new light on the subject, and never declare a statute void unless the nullity and invalidity of the act are placed, in their judgment, beyond a

reasonable doubt.' *Wellington et al., Petitioners,* 16 Pick. 87, 95, per Shaw, C. J. 'It is but a decent respect due to the wisdom, the integrity, and the patriotism of the legislative body by which any law is passed,' says Justice Washington, 'to presume in favor of its validity, until its violation of the Constitution is proved beyond all reasonable doubt.' *Ogden* v. *Saunders,* 12 Wheat. 213, 270. Of course if courts are bound to be thus careful where a single statute involving a doubt has been passed, it behooves them to be still more careful, if possible, after several such statutes have been passed from time to time by different legislatures, without either question or protest. A long continued legislative construction is entitled to great weight with the courts, if not clearly erroneous.'' See also *In re Dorrance-Street,* 4 R. I. 230, and *State* v. *Keeran,* 5 R. I. 497.

In the case of the State Board of Charities and Corrections we have seen that the power of confirming or rejecting the nomination of the governor was conferred on the senate in 1869. Whether the lapse of nearly forty years may not be a sufficient length of time to create a legislative construction which should be controlling is not now the question, but it is surely proper to observe that this question is now propounded for the first time.

I am, accordingly, of the opinion and so advise, that "the provisions of law respecting the election of officers by the senate contained in sections 62 and 63 of Chapter 809 of the Public Laws, passed at the January Session 1901," are constitutional and valid.

                                    JOHN TAGGARD BLODGETT.

PROVIDENCE, April 21, 1908.

The following opinion was delivered to the governor by the justices of the Supreme Court, March 2, 1903, in the matter of

## ELECTION OF SCHOOL COMMITTEE OF THE CITY OF WOON-SOCKET.

Article VII, § 1 of the amendments to the constitution, provides for the qualification of electors and that they "shall have a right to vote in the election of all civil officers and on all questions in all legally organized town or ward meetings."

The charter of the city of Woonsocket provides that the city council shall elect members of the school committee:—

*Held,* that the constitution gave to the electors the right to vote for all officers who are to be elected in town or ward meetings by the people under the constitution or by law.

*Held,* further, that the course of legislation and practice of election from the adoption of the constitution has been both a contemporaneous and continuous interpretation that the right of the electors was to vote for all officers who are to be elected by the people, but not that they shall have such right in the case of officers whose election under the law is not to be made by the people.

PROVIDENCE, R. I., March 2, 1903.

*To His Excellency, Lucius F. C. Garvin, Governor of the State of Rhode Island and Providence Plantations.*

We have received from your excellency the following question:

"Are the provisions for the election of school committee in the city of Woonsocket, contained in clause 2 of section 12 of chapter 728 of the Public Laws, passed June 13, A. D., 1888, in conflict with section 1 of article VII of the amendments to the constitution of the State?"

The clause of the charter of the city of Woonsocket referred to provides that the city council shall elect members of the school committee of that city.

Article VII, section 1, of the amendments to the constitution of the State provides for the qualification of electors, and that they "shall have a right to vote in the election of all civil officers and on all questions in all legally organized town or ward meetings."

We assume, therefore, that the point of inquiry is whether the right to vote for all civil officers is so far guaranteed to electors as to render an election by any other body a violation of the terms of that article.

There can be no doubt that members of a school committee are civil officers.

The question then, is, do the words imply that every elector has the right to vote for all civil officers, so that all civil officers must be chosen by a vote of the people?

Neither the words themselves nor the practice under them carry a necessary implication to that effect. The words are not "a right to vote for all civil officers," but "in the election of all civil officers," in town or ward meetings. They are entirely consistent with the interpretation that they give to all electors the right to vote for all officers who are to be so elected by the people under the constitution or by law, other than those specially excepted.

This was the interpretation given to the same words then, in article II, section 2, of the constitution, immediately after the adoption of the constitution; for at the first session of the General Assembly under it an act was passed that in case any town shall, on the day of any such annual election, fail to elect any of the officers which they may lawfully choose (except town clerk, council, justices of the peace, and treasurer), the said officers shall be elected by the town council of the town at their next meeting; and the several towns shall have full power to delegate to their respective councils the election of any of the officers, except as above. This was a provision by law for certain elections other than by the people. May session, 1843, p. 5.

In Public Laws 1844, the first digest after the constitution, the act relating to the election of town officers, p. 300, provides that the electors shall annually "choose and elect so many town officers as by the laws of this state are or shall be required," a provision which goes back to the digest of 1719, and which has continued to the present time. It clearly implies that the electors are to elect only such officers as are required by law to be so elected. In the same digest, p. 103, it was en-

acted: "The general assembly may elect so many justices of
the peace for any town as they shall think proper, in addition
to those elected by such town."

In 1839, Public Laws, p. 1092, it was provided: "In the city
of Providence the school committee shall be elected by the
city council at the commencement of the municipal year."
This was continued in force by the school act of June, 1845,
and remained the law for the city down to January, 1854, p.
1060, when it was changed to the election of fourteen members
of the school committee by the people, fourteen by the council,
and two *ex officio*.   January, 1859, the election of all members
was given to the people.   From the time of the adoption of the
constitution to the present time the office of commissioner of
public schools, quite as much a civil office as that of member of
a school committee, and far more important, has been filled by
the governor's appointment, and in recent years by the State
Board of Education.   During all this time civil officers
have been elected constantly by the General Assembly,
by town and city councils, and appointed by the governor, who
would have had no title to their offices if the provision required
an election by the people in all cases.   The General Assembly
has uniformly elected sheriffs, clerks of court, justices of the
peace, notaries public, state auditor, insurance commissioner,
and numerous others, without a question as to the legality of
the procedure.

Evidently the constitution has not been understood to
guarantee a right to every elector to vote for every civil officer.
The course of legislation and practice of election, which we
have noted, have been both a contemporaneous and continuous
interpretation that the right to vote for all civil officers means
"officers as by the laws of this state are or may be required."
It recognizes the right of electors to vote for all officers, who
are to be elected by the people, except as provided, but it does
not require that electors shall vote for all officers whose election,
under the law, is not to be made by the people.

We must either say that the constitution allows the General
Assembly to provide by law for some elections by civil officers
by itself, by councils, or by the governor; or else that it re-

quires all such elections to be made by popular vote. This latter view has never been held in this State, and we do not understand that it is claimed to be so by anyone. The suggestion presented to us, in behalf of citizens of Woonsocket, is this: that the registry voters have a right in the constitution to vote for all civil officers, except members of a city council; hence, when the city council elect the school committee, the registry voters are thereby deprived of any part in their election, either directly or by representation. It is true that an election by a city council operates in this way; but the question before us is one of constitutionality, not of policy. If the right to vote for all civil officers, other than city council, carries a right to vote for school committee, then it carries the right to vote for all other officers that are elected by a city council. To so construe the provision, and to require all the numerous officers now chosen by town and city councils to be elected by the people, would be contrary to the unbroken custom since the constitution was adopted, and contrary to the accepted and unquestioned meaning of its terms during all that time. It would practically declare that all the administrative officers, for more than half a century, have been illegally elected. We do not think that it was ever intended to require all civil officers to be elected by the people, for it would be impracticable. Custom and reason unite in showing that it was not so. If not, then it applies, as the law in this State has always provided, to such "officers as by the laws of this State are or shall be required."

It is argued that if this construction be given it will allow elections to be withdrawn from the people. The question is not what may be done; but what the constitution requires. It requires certain officers to be elected by the people. It does not require other officers to be so elected. These are to be provided for by law. If unsatisfactory laws are made, the presumption is that the people will choose legislators who will make a change. It is urged that the opinion *In re Newport Charter*, 14 R. I. 655, supports the right of registry voters to vote in the election of all civil officers. Undoubtedly it does; but the question there raised was very different from this one.

In that case the General Assembly had amended the charter of Newport by providing that only taxpayers should vote for the city council.  As the constitution, at that time, confined that limitation to the city of Providence, it was clear that it could not be extended by the legislature.  The charter of Woonsocket, relating to the election of school committee, violates no provision of the constitution, and is sustained by the practice under it.  We therefore answer the question, proposed to us by your excellency, in the negative.

> JOHN H. STINESS,
> PARDON W. TILLINGHAST,
> GEORGE A. WILBUR,
> WILLIAM W. DOUGLAS,
> EDWARD C. DUBOIS,
> JOHN T. BLODGETT.